Donald K. KASPAREK and Rose Marie Kasparek, for Themselves and for Their Grantees and Assigns, Appellees,

v.

The JOHNSON COUNTY BOARD OF HEALTH, Appellant,

Evelyn C. Weeber, Chairperson of the Johnson County Board of Health, Lee Dameron, Director, and Dr. Charles A. DeProsse, Mari S. Greb, Pauline McAreavy and Orval Yoder, Members of the Board, Johnson County, Iowa, Lorada Cilek, Chairperson of the Board of Supervisors of Johnson County, Iowa, Donald Sehr and Harold M. Donnelly, Members of the Board, Defendants,

James R. Bulechek, Jr., Paul Carney, James Casterline, Milo Naxera, United State Bank, and Lincoln A. Zarub, Intervenors.

No. 62420.

Supreme Court of Iowa.

Feb. 20, 1980.

J. Patrick White, First Asst. Johnson County Atty., for appellant.

Edward F. Rate, Iowa City, and Mitchell E. Turner, Cedar Rapids, for appellees.

William H. Bartley, Iowa City, for intervenors.

REYNOLDSON, Chief Justice.

Plaintiffs and intervenors are developers of subdivisions and owners of lots in the Lake Macbride watershed in Johnson County. By declaratory judgment action brought against Johnson County Board of Health (Board) and Johnson County board of supervisors they sought to nullify the retroactive aspect of a regulation adopted by the Board and approved by the board of supervisors as it applied to their pre-platted subdivisions. This regulation prescribed a minimum five-acre tract as a prerequisite for a permit to install a septic tank disposal system. A grandfather clause protected all previously platted and approved subdivisions in "areas of the County lying outside the Lake Macbride water shed." Following trial, district court held this provision was "unconstitutional and void and ineffective" against plaintiffs and intervenors. The Board (but not the board of supervisors) appealed. We affirm.

Plaintiffs filed a motion to dismiss the appeal, contending (1) the Board had no authority to appeal independently of the board of supervisors, and (2) by payment of district court costs the Board "acquiesced in and confirmed" the district court judgment and is now estopped from prosecuting this

appeal. We ordered this motion submitted with the appeal and now overrule it in division I, below.

The Board asserts that plaintiffs and intervenors have not carried their burden to show the controverted regulation was unconstitutional as to them, and in any event they are barred by laches from attacking the validity of the regulation.

Plaintiffs argue the points relied on in their motion and defensively contend they were not guilty of laches. They assert district court did not err in finding the challenged portion of the health regulation was unconstitutional as violative of due process.

I. *Motion to dismiss appeal.*

A. Although in this litigation plaintiffs named as defendants both the Board and the board of supervisors, they now contend the former has no authority independently to pursue this appeal. They assert the Board as a mere "agency or instrumentality" of the county lacks the capacity to sue and be sued, citing among other decisions *Des Moines Park Board v. City of Des Moines*, 228 Iowa 904, 290 N.W. 680 (1940), and *Hanson v. City of Cresco*, 132 Iowa 533, 109 N.W. 1109 (1906). Plaintiffs point out the Board is not incorporated by statute or otherwise, has no express power to sue or be sued, and cannot promulgate health regulations without the approval of the board of supervisors. The Board's members are not elected.

■ Nevertheless, although the issue is close, we hold the Board does have authority to bring this appeal. Pursuant to section 137.6(2), The Code, it has a basic power to

> [m]ake and enforce such reasonable rules and regulations not inconsistent with law or with the rules of the state board as may be necessary for the protection and improvement of the public health.

Although the rules and regulations of the Board must be approved by the county board of supervisors, § 137.6(2)(a), there is no statutory requirement the Board must obtain the supervisors' approval in its enforcement function. *See Local Board of Health v. Wood*, 243 N.W.2d 862 (Iowa

1976). "In determining the validity of the acts of such boards (of health and like commissions) . . . a liberal construction [of implementing statutes] is justified, in view of the public good to be accomplished." *Walker v. Sears*, 245 Iowa 262, 266, 61 N.W.2d 729, 731 (1953), *quoting from Hengehold v. City of Covington*, 108 Ky. 752, 756, 57 S.W. 495, 496 (1900).

It would be an anomaly if those in violation of a local health board's regulations could avoid enforcement by a preempting declaratory judgment action in which the agency charged with enforcement could not be a party. It would be more anomalous to hold that where the local board of health was made a party, it could not defend its regulation by appeal.

Section 137.5 grants the county board of health "jurisdiction over public health matters within the county." It certainly is conceivable that a board operating within such jurisdiction might find occasion to exercise quasi-judicial power. In such event, its action should be subject to review as a defendant in a certiorari proceeding. *See Cedar Rapids Human Rights Commission v. Cedar Rapids Community School District*, 222 N.W.2d 391, 397–401 (Iowa 1974).

■ The authorities plaintiffs rely on are rooted in the prior doctrine that counties, municipalities and their local agencies have only such powers as are expressly granted by the legislature. This principle is no longer valid following adoption of the home rule amendments. Iowa Const. art. III, § 38A (as added by amend. 25 in 1968) (municipal home rule); Iowa Const. art. III, § 39A (as added by amend. 37 in 1978) (counties home rule). *See Cedar Rapids Human Rights Commission*, 222 N.W.2d at 398–99.

■ Plaintiffs' myopic concentration on the Board's chapter 137 powers ignores its extensive authority under other statutory provisions. *See, e. g.*, §§ 139.3 (authority to impose and enforce isolation and quarantine restrictions), 139.9(7) (immunization of children), 140.8 (examination of persons reasonably suspected of having venereal disease),

170A.4 (local health board by agreement between governmental subdivision and secretary of agriculture shall "license, inspect and otherwise enforce" the Iowa food service sanitation code), 170B.3 (under similar circumstances, license, inspect and otherwise enforce the Iowa hotel sanitation code), 170B.17 (violations of Iowa hotel sanitation code may be restrained by injunction), 191A.14 (local health board by agreement between governmental subdivision and secretary of agriculture shall enforce the food and vending machine laws), 351.36 (enforce statutory provisions relating to vaccination and impoundment of dogs), 351.39 (order owner of animal suspected of rabies which has bitten a person to confine it, and on failure to do so to apprehend and confine the animal), 351.40 (on belief rabies to be epidemic in its jurisdiction, to declare quarantine), 455B.77 (executive director of solid waste disposal commission of the department of environmental quality may delegate administrative duties of the department to local boards of health). These duties and responsibilities should cloak this Board with sufficient independent stature to pursue an appeal from an adverse decision in which it was a named defendant.

We find support for our holding in *Local Board of Health v. Wood*, 243 N.W.2d 862; *Cedar Rapids Human Rights Commission*, 222 N.W.2d 391; *Board of Adjustment v. Ruble*, 193 N.W.2d 497 (Iowa 1972). *See Police Pension & Relief Board v. Goldman*, 486 P.2d 469, 471 (Colo.App.1971); *Cunningham v. Leimkuehler*, 276 S.W.2d 633 (Mo. App.1955); *Board of Adjustment v. Stovall*, 147 Tex. 366, 216 S.W.2d 171 (1949).

■ We are not concerned in this appeal with the question whether the Board could maintain litigation against the County. *Compare Board of Park Commissioners v. City of Marshalltown*, 244 Iowa 844, 58 N.W.2d 394 (1953) *with Des Moines Park Board v. City of Des Moines*, 228 Iowa 904, 290 N.W. 680. *See also Southeast Warren Community School District v. Department of Public Instruction*, 285 N.W.2d 173 (Iowa 1979); *Iowa Department of Revenue v. Iowa State Board of Tax Review*, 267

N.W.2d 675 (Iowa 1978). It is enough for the purposes of this appeal to hold that the Board's affirmative power to enforce its rules and regulations carries with it a concomitant power to defend them and resist their nullification in court.

■ B. Plaintiffs' assertion that this appeal must be dismissed because the district court costs were paid, in absence of a showing of actual intent to abandon the appeal, is without merit. *See Vermeer v. Sneller*, 190 N.W.2d 389, 395–96 (Iowa 1971). *Accord, Millsap v. Cedar Rapids Civil Service Commission*, 249 N.W.2d 679, 683 (Iowa 1977).

The motion to dismiss this appeal is overruled.

II. *Constitutionality of the health regulation provision as to these plaintiffs and intervenors.*

This declaratory judgment proceeding was brought and tried in equity. *See Northern Natural Gas Co. v. Forst*, 205 N.W.2d 692, 694 (Iowa 1973); Iowa R.Civ.P. 261–269. Our review is de novo; we give weight to trial court's fact findings but are not bound by them. Iowa R.App.P. 14(f)(7).

We are not examining the validity of the challenged regulation to the extent it creates a separate classification for the Lake Macbride watershed generally. Our review is limited to the reasonableness of the regulation as applied to these plaintiffs and intervenors. "[A]n ordinance may be valid in its general aspect and at the same time be clearly arbitrary and unreasonable as applied to a particular state of facts." *Keller v. City of Council Bluffs*, 246 Iowa 202, 209, 66 N.W.2d 113, 117 (1954). *See also Nectow v. City of Cambridge*, 277 U.S. 183, 187–89, 48 S.Ct. 447, 448, 72 L.Ed. 842, 844–45 (1928) (inclusion within zoning ordinance of tract of land not indispensable to general plan, and without *substantial* necessity for inclusion by reason of health, safety and general welfare of citizens, held to violate fourteenth amendment *as applied*).

The parties agree the rules laid down in our zoning law decisions provide the basic legal principles to be applied here. We

stated in *Keller*, 246 Iowa at 210, 66 N.W.2d at 118, that if the only reasonable use of property is seriously affected by a zoning ordinance, the owner should be entitled to relief. This principle was more recently reaffirmed in *Business Ventures, Inc. v. Iowa City*, 234 N.W.2d 376, 382 (Iowa 1975), where we stated:

> Where it appears that under existing zoning restrictions property must remain for an unpredictable future period unimproved, unproductive and a source of expense to the owners from heavy taxes, the zoning ordinance is unreasonable as to such property. A zoning of land [for a particular purpose] is unreasonable and confiscatory and therefore illegal where it is practically impossible to use the land in question for [that purpose].

(Quoting from 8 E. McQuillin, *The Law of Municipal Corporations* § 25.45, at 118–19 (3d ed. 1965).) *Accord, Petersen v. City of Decorah*, 259 N.W.2d 553, 554–55 (Iowa Ct. App.1977). *See generally* 8 E. McQuillin, *The Law of Municipal Corporations* § 25.45, at 111 (3d ed. rev. 1976) ("Even though a zoning ordinance may be valid in its general aspects, yet in its application to a particular piece of property it may be so clearly arbitrary and unreasonable as to result in confiscation in violation of the constitutional rights of the owner.").

Turning to the facts we deem controlling, certain events are uncontested.

Plaintiffs' two subdivisions in the Lake Macbride watershed, Lake Crest Manor Part I and Lake Crest Manor Part II, were platted and given final approval by the Johnson County board of supervisors on October 10, 1966, and November 12, 1968, respectively. The land in question was zoned for residential use at all relevant times.

Intervenors are similarly situated landowners and developers in the Lake Macbride watershed.

November 18, 1968, the Board adopted new regulations relating to private sewage disposal system (septic tank) permits. Section III required a permit prior to construction of a sewage disposal system. Subsection D required five-acre minimum lots in the Lake Macbride watershed, three acres in the Coralville Reservoir watershed and only one acre in the remainder of Johnson County. Subsection E provided previously platted and approved developments did not have to meet Subsection D requirements, but excluded the Lake Macbride watershed (and thus the plaintiffs and intervenors, whose lots are less than five acres) from the "grandfather clause" benefit.

Pursuant to section 137.6(2)(a), the above regulation was approved by the Johnson County board of supervisors on November 25, 1968, and published on December 6, 1968.

Plaintiffs' evidence established their subdivision lots were approximately one-half to three-quarters of an acre. They had expended substantial sums in the development and platting of the area prior to the effective date of the Board's regulations. Because of the "patchwork" of sold and unsold lots, the tracts, assuming the validity of the Board's regulations, are now unsuitable for either residential or agricultural purposes. The mix of sold and unsold lots makes it difficult if not impossible to reach the five-acre requirement.

The record also indicates the five-acre tract requirement was imposed "to separate out and dampen the impact of sewage recharge into the ground water." The Lake Macbride watershed was not accorded the grandfather exception because it was viewed as one of "multiple risks" both as to surface and ground water, and because the occasional near zero flow into the lake at times created a diminished dilution factor. The Board claimed percolation tests of the Lake Macbride area disclosed some soils were incapable of adequately absorbing sewage discharge. This, it asserts, would result in sewage discharge over the ground and into the lake.

On the other hand, both Mr. Kasparek and one of the Board's experts testified there was no evidence of pollution of Lake Macbride by private sewage systems, nor evidence such pollution would occur. Another Board expert stated that "the majori-

ty of pollutant problems and the like are non-residentially caused or related." The evidence disclosed most of the Lake Macbride watershed is either undeveloped or held by the state as parkland.

There is evidence in the record the regulation's anticipated severe impact upon plaintiffs and intervenors was made known to the Board prior to its adoption. In most instances, the areas in question were served by central wells, so individual well contamination was not a major problem. The Board was aware erosion and livestock and animal wastes were the predominant pollution sources.

Attempts to establish a sanitary district had failed because of the reluctance of the Johnson County Regional Planning Commission to approve a district to qualify it for federal funding until completion of a countywide land use study. A report of the planning commission ultimately recommended the retroactive application not be retained, but that performance standards and a periodic inspection program be established. As late as December 1975 a Board expert admitted in a letter that central sewage systems for the area "do not seem to be a possibility for the foreseeable future." Furthermore, the Board knew the regulations were of questionable constitutionality and "would definitely be subject to legal challenge in the future."

Trial court found "it has not been reasonable of the Board of Supervisors to allow the plats to be approved and development begun and then prohibit the granting of disposal permits to the already platted and developed territory." It decreed that portion of the regulation which excluded the Lake Macbride watershed from the grandfather clause for previously platted and approved subdivisions was unconstitutional as to these plaintiffs and intervenors.

Plaintiffs concede regulations concerning disposal of sewage may be a valid exercise of police power. *See State v. City of Iowa Falls*, 247 Iowa 558, 563, 74 N.W.2d 594, 597 (1956). "Even the exercise of police power, however, may amount to a taking if it deprives a property owner of

the substantial use and enjoyment of his property." *Woodbury County Soil Conservation District v. Ortner*, 279 N.W.2d 276, 278 (Iowa 1979). This case thus concerns the permissible area of police power. Before the Board's regulation may be imposed on behalf of the public it must appear (1) that the interests of the public require such interference, and (2) that the means are reasonably necessary for the accomplishment of the purpose, and not unduly oppressive upon individuals. *Goldblatt v. Town of Hempstead*, 369 U.S. 590, 594–95, 82 S.Ct. 987, 990, 8 L.Ed.2d 130, 134 (1962). The basic issue of reasonableness of a safety or health measure involves analysis of

such things as the nature of the menace against which it will protect, the availability and effectiveness of other less drastic protective steps, and the loss which appellants will suffer from the imposition of the ordinance.

*Id.* at 595, 82 S.Ct. at 990, 8 L.Ed.2d at 134. *See also Green v. Shama*, 217 N.W.2d 547, 554 (Iowa 1974). The burden to prove the proviso unreasonable, arbitrary, capricious or discriminatory is upon the one asserting the invalidity. *Board of Supervisors v. Miller*, 170 N.W.2d 358, 360 (Iowa 1969). Evidence of invalidity must be clear. *Ortner*, 279 N.W.2d at 277; *Incorporated Town of Carter Lake v. Anderson Excavating & Wrecking Co.*, 241 N.W.2d 896, 901 (Iowa 1976). If the validity of the legislative classification is fairly debatable, the legislative judgment must be allowed to control. *Business Ventures*, 234 N.W.2d at 381; *Brackett v. City of Des Moines*, 246 Iowa 249, 260, 67 N.W.2d 542, 547 (1954). *See also Goldblatt*, 369 U.S. at 595, 82 S.Ct. at 990, 8 L.Ed.2d at 134; *Miller*, 170 N.W.2d at 360–61. But as the United States Supreme Court observed in *Penn Central Transportation Co. v. New York City*, 438 U.S. 104, 127, 98 S.Ct. 2646, 2661, 57 L.Ed.2d 631, 650 (1978), "It is of course implicit in *Goldblatt* that a use restriction on real property may constitute a 'taking' if not reasonably necessary to the effectuation of a substantial public purpose . . . or perhaps if it has an unduly harsh impact upon the own-

er's use of the property." (Citations omitted.)

The briefs filed here by plaintiffs and the Board address the issue whether plaintiffs' pre-regulation expenditures on these subdivisions blanket plaintiffs with the zoning law "vested rights" protection. The Board does not argue that doctrine is inapplicable in this type of situation; it simply argues the evidence in this case does not meet the requirements for imposing it.

■ The vested rights concept is a part of the balancing of the respective legitimate interests of the private property owner against those of the general public, keeping in mind that legitimate and valuable expenditures in connection with the use of an affected tract or in a business conducted on it, before imposition of the regulation, may create a property right which cannot be arbitrarily interfered with or taken away without just compensation. *Incorporated Town of Carter Lake*, 241 N.W.2d at 902; *Board of Supervisors v. Paaske*, 250 Iowa 1293, 1296–99, 98 N.W.2d 827, 829–31 (1959); *Stoner McCray System v. City of Des Moines*, 247 Iowa 1313, 1320–21, 78 N.W.2d 843, 849–50 (1956); *Keller v. City of Council Bluffs*, 246 Iowa at 212–13, 66 N.W.2d at 119.

In this case plaintiffs produced evidence they had expended almost $13,000 in the development and improvement of their subdivisions before the effective date of the regulations. There was strong evidence to support trial court's finding that plaintiffs and intervenors had "incurred substantial expenses and investments in their developments relying on the action of the Board of Supervisors." Whatever may be inferred as to their knowledge of the Board of Health's position on the regulation prior to the approval of the plats by the board of supervisors is irrelevant, since the Board's proposed regulation was of no effect until adopted by the board of supervisors. § 137.6(2)(a), The Code. The supervisors considered and approved the regulation in issue only after they had approved both plats submitted by the plaintiffs.

■ Frustration of "investment-backed expectations" may amount to a taking. *Penn Central Transportation Co. v. New York City*, 438 U.S. at 127, 98 S.Ct. at 2661, 57 L.Ed.2d at 650; *Woodbury County Soil Conservation District v. Ortner*, 279 N.W.2d at 278. In *Penn Central*, the Court held no taking had occurred because there was no interference with the property owner's "primary expectation concerning the use of the parcel." 438 U.S. at 136, 98 S.Ct. at 2666, 57 L.Ed.2d at 656. But it is precisely this "primary expectation" of plaintiffs and intervenors which would be destroyed by the challenged regulation.

The most analogous Iowa decision is *Board of Supervisors v. Paaske*, 250 Iowa 1293, 98 N.W.2d 827. There plaintiffs had acquired a 2.4-acre tract and excavated basements for four houses and incurred other obligations before LeClaire Township School District No. 4 adopted a county zoning ordinance which prescribed a minimum one-acre lot for a one-family residence. We held the Paaskes had acquired a vested right prior to the effective date of the ordinance and "[a]s a matter of right and in equity they should be permitted to finish the houses, develop the surrounding yards, and prepare the homes for occupancy." *Id.* at 1300, 98 N.W.2d at 831.

■ We hold the unreasonableness of the challenged portion of the Board's regulation, as applied to these plaintiffs and intervenors, is not fairly debatable. In our de novo review we have weighed the evidence relating to the unfortunate situation of these property owners. The burden placed upon these few individuals is large, but testimony indicates there was neither evidence of present pollution of Lake Macbride by private sewage systems, nor evidence such pollution would occur. Only necessity justifies the exercise of police power to take private property without compensation. *Stoner McCray System*, 247 Iowa at 1319, 78 N.W.2d at 848.

On behalf of the public, we have considered the evidence which tends to show the alleged risk of pollution from private sewage disposal systems generally. But a

former Board member testified at a later Board meeting that the regulation was enacted in response to faulty percolation test result reports. Regulations of the State Department of Health prohibit construction of private sewage treatment systems where, due to soil conditions, the percolation rate exceeds sixty minutes per inch of water absorption. *See* 470 I.A.C. § 12.-7(2)(b)–(c). If, as the Board's witness James L. Shive suggested, septic tank systems could not be constructed on certain tracts under state standards due to inadequate soil percolation, it is plain that standard controlled and the challenged regulation was not "reasonably necessary to the effectuation of a substantial public purpose." *Penn Central,* 438 U.S. at 127, 98 S.Ct. at 2661, 57 L.Ed.2d at 650 (relying on *Goldblatt*).

The Pennsylvania Supreme Court faced an analogous factual situation in *National Land & Investment Co. v. Easttown Township Board of Adjustment,* 419 Pa. 504, 215 A.2d 597 (1965). Observing that zoning ordinances must bear a *substantial* relationship to police power purposes, *id.* at 522, 215 A.2d at 607, the court held that despite the township engineer's testimony indicating a danger of future pollution from sewage, four acre minimum zoning was "neither a necessary nor a reasonable method by which [the township could] protect itself from the menace of pollution." *Id.* at 526, 215 A.2d at 609. The court's holding was based on the availability of "legislatively sanctioned [alternative] methods for dealing with the sewage problem," including "requir[ing] lots larger than the minimum permitted by the zoning ordinance if the result of percolation tests upon the land show[s] that a larger land area is needed for proper drainage and disposal of sewage." *Id.* We believe Johnson County similarly can protect itself from the perceived menace of pollution through currently available and less drastic means, and that the blanket inclusion of these plaintiffs and intervenors, with their "investment-backed expectations," was not "reasonably necessary to the effectuation of a substantial public purpose."

In *Ortner,* we recently held the conflicting testimony concerning the possibility of other alternatives, the diminution of profits, and the decrease in value of the land "is not the kind of clear and compelling evidence necessary as a premise for holding a statute unconstitutional." 279 N.W.2d at 279. Such is not the case here. A Board expert admitted the only possible alternative which would allow residential construction, a central sewage system, "do[es] not seem to be a possibility for the foreseeable future." We agree with trial court's finding the property "lost its value for other [*i. e.,* nonresidential] purposes upon the sale of lots and the building of residences," and that plaintiffs "have demonstrated by clear evidence that these lots have little or no value except residential." Unlike the *Penn Central* and *Ortner* cases, in which the property owners were merely deprived of the most beneficial use of their property, plaintiffs and intervenors would be deprived of *any* reasonable use of their land by the regulation under attack.

The situation here is different from that in *Consolidated Rock Products Co. v. City of Los Angeles,* 57 Cal.2d 515, 20 Cal.Rptr. 638, 370 P.2d 342, *appeal dismissed,* 371 U.S. 36, 83 S.Ct. 145, 9 L.Ed.2d 112 (1962). There, plaintiffs sought a variance from a long-standing ordinance zoning their 348-acre tract for residential and agricultural use in order to *start up* a business— quarrying—which had not been conducted on the property for at least 23 years, and which had been a nonconforming use even then. But in the instant case, plaintiffs and intervenors merely seek to *complete* their ongoing subdivision projects for which their property was appropriately zoned at all relevant times.

As the Court observed in *Penn Central,* 438 U.S. at 124, 98 S.Ct. at 2659, 57 L.Ed.2d at 648, "whether a particular restriction will be rendered invalid by the Government's failure to pay for any losses proximately caused by it depends largely 'upon the particular circumstances [in that] case.'" (Citing cases.) *Accord, Agins v. City of Tiburon,* 24 Cal.3d 266, 277, 598 P.2d 25, 31, 157

Cal.Rptr. 372, 378 (1979), *prob. juris. noted,* —— U.S. ——, 100 S.Ct. 658, 62 L.Ed.2d 639 (1980). Bearing in mind that the regulation will apply to all future developments, the nebulous nature of the testimony relating to the risk, and the already available remedies relating to percolation test monitoring and enforcement, and to nuisances, we agree that the exception to the regulation's grandfather clause is clearly unreasonable as to these plaintiffs and intervenors. It would unconstitutionally deprive them of valuable property interests. We hold trial court was right in determining that plaintiffs and intervenors in this case acquired vested rights with respect to these pre-platted lots. Without just compensation, they cannot be deprived of their right to use these tracts for residential purposes, employing septic tank systems.

Of course this does not mean these parties have a vested right to create or maintain either a public or private nuisance. Owners of waste disposal systems which pollute, cause health hazards, obnoxious fumes or other conditions falling within common-law or statutory definitions of public or private nuisance may be subjected to the remedies the law provides. *See Pottawattamie County v. Iowa DEQ,* 272 N.W.2d 448, 453 (Iowa 1978); *Kriener v. Turkey Valley Community School District,* 212 N.W.2d 526, 530–31 (Iowa 1973); *Bader v. Iowa Metropolitan Sewer Co.,* 178 N.W.2d 305, 307 (Iowa 1970).

III. *Claim that plaintiffs and intervenors are barred by laches from attacking the regulation.*

Lastly, we briefly analyze the Board's contention that plaintiffs and intervenors are barred by laches from attacking the regulation. While no legal action was taken until the petition was filed in this case on November 16, 1976, the record discloses these owners were continually complaining about the regulation and at one time secured the Board's vote to repeal the exception to the grandfather clause. This action was reversed when different board members took office.

Laches is an affirmative defense and the party asserting the doctrine has the burden to establish its essential elements by clear, convincing and satisfactory evidence. *Anita Valley, Inc. v. Bingley,* 279 N.W.2d 37, 41 (Iowa 1979). Here the Board did not plead the defense of laches in its answer. In any event, the record does not disclose the delay harmed the Board or resulted in prejudice to it. *See Davidson v. Van Lengen,* 266 N.W.2d 436, 439 (Iowa 1978).

This issue raised by the Board is without merit.

We affirm the trial court's decree.

AFFIRMED.

All Justices concur except McCORMICK, REES, UHLENHOPP, and HARRIS, JJ., who dissent.

McCORMICK, Justice (dissenting).

I am unable to agree with division II or the result. The court's evaluation of the evidence departs from the principle that debatable questions as to reasonableness of an enactment are not for the courts but for the legislative body. *See Goldblatt v. Town of Hempstead,* 390 U.S. 590, 595, 82 S.Ct. 987, 990, 8 L.Ed.2d 130, 134 (1962); *Adams v. Bonacci,* 287 N.W.2d 154 (Iowa 1980); *Incorporated Town of Carter Lake v. Anderson Excavating and Wrecking Co.,* 241 N.W.2d 896, 901 (Iowa 1976). Furthermore, the court's view of the law cannot be reconciled with the recent reiteration and application of relevant principles in *Woodbury County Soil Conservation District v. Ortner,* 279 N.W.2d 276, 277–79 (Iowa 1979).

I. *The evidence.* Even though the validity of a police power enactment depends on its reasonableness, the constitutional inquiry is not answered by the court's determination of what is reasonable. *See Goldblatt,* 390 U.S. at 595, 82 S.Ct. at 990, 8 L.Ed.2d at 134 ("this Court has often said that 'debatable questions as to reasonableness are not for the courts but for the Legislature . . . '"); *Adams,* 287 N.W.2d at 154 ("Unless a law has no rational relationship to its intended purpose, we

must defer to the legislature as to its wisdom. A challenging party must negate every reasonable basis upon which the act can be upheld."); *Carter Lake*, 241 N.W.2d at 901 ("If [an ordinance] tends to accomplish a proper municipal object in a way which can find justification in the minds of reasonable people, it is reasonable. It is not unreasonable simply because a better means of accomplishing the same object might be conceived, nor is it unreasonable because it restricts the free use and enjoyment of property."). Thus, the court's task in the present case is to determine whether plaintiffs and intervenors met their burden to negate every rational basis for the conclusion of the board of health that the 1968 regulation was necessary to protect the public health. Examined in this light, the record shows they did not meet their burden.

The only persons who testified against the 1968 regulation at trial were plaintiffs Donald L. Kasparek and Rose Marie Kasparek. Donald said only seven of the twenty-three lots in his 1966 subdivision and only seven of the forty-two lots in his 1968 subdivision were unsold at the time of trial. A sale of two other lots in the second subdivision was being held up because of the purchasers' inability to get a permit for a septic tank. Of the seven unsold lots in the second subdivision, plaintiffs had set aside four for other purposes and expected to sell another to an adjacent owner. Although they showed their gross expenses in developing the tracts, they did not show they would suffer anything other than a diminution of profit if the remaining lots remained unsold. Nor did they offer any proof to show the extent of that lessening of profit.

Their evidence revealed they had actual notice of the proposed health regulation before they obtained approval of their second subdivision in 1968. While their second plat was still awaiting board of supervisors approval, they knew the board of health had already rejected their objection to the regulation.

The regulation does not foreclose development of affected lots. It simply requires a central sewage disposal system to be used, but includes an exception authorizing permits for private septic tanks if lots are aggregated into five-acre parcels.

Plaintiffs and intervenors offered no evidence to show it was unreasonable for the board of health to conclude that private septic tanks on each lot of the affected subdivisions would pose a sufficient risk to public health to justify the regulation. They did not explain why a central sewage system such as provided for in chapter 358, The Code, could not rationally be prescribed.

Intervenors established by stipulation that they owned vacant lots at the time of trial in subdivisions which were platted before the effective date of the regulation but which were subject to it. United State Bank, which did not acquire its lots until 1969, showed it had listed them for sale without success. It was agreed that one intervenor had been denied a septic tank permit because his lot was less than five acres in size. Intervenors' evidence proved only that the regulation was being applied to them as it was being applied to plaintiffs, with similar results.

The only evidence on the public health issue was that of the board. Its evidence was that even a properly functioning septic tank poses health risks because it does not actually dispose of sewage. It removes approximately fifteen percent of the sewage strength by settling out solids but disperses the remainder of the sewage into the surrounding earth. What happens to it after that is a function of evaporation rate and absorptive qualities of the soil. The board's evidence was that the evaporation and absorptive deficiencies were so great in the area of the watershed that pollution from private systems would inevitably reach Lake Macbride. Board witnesses said the problem was compounded by the absence of effective dilution because of the zero flow rate of the lake. This combination of factors was uniquely present in the area affected by the 1968 regulation. The board concluded the only effective remedy was a central system which would take the sew-

age elsewhere. However, the five-acre exception was added to the regulation as an expedient because the risk of pollution would be less if the number of households using septic tanks could be reduced.

Much of the board's evidence came from testimony of Richard Shive, a civil engineer, who performed percolation tests in the watershed in 1964. He said he did so because he had "become aware of several sewage installations that had been made on the northerly portion of the lake which had failed and were discharging sewage on top of the ground, and which then ran into Lake Macbride and into the Coralville Reservoir." Through his tests he demonstrated to the satisfaction of county officials that the engineer who made similar tests for the developers and individual lot owners, including plaintiffs, was producing inaccurate results. As a consequence, that engineer was barred from further testing. Shive testified that "on the basis of many percolation tests in the general area of the north arm and the failed systems, I concluded that the information was representative of the area and therefore the value of the property was marginal . . . at that time, because a [septic tank] system couldn't be built by then existing state standards." He said two lots he tested in the Kasparek subdivisions were valueless in the absence of a central sewage disposal system because their percolation rate exceeded state standards. He believed a septic tank on one of the lots, although functioning properly, was actually polluting Lake Macbride at that time.

Shive became a member and chairman of the board of health after the Local Health Act, chapter 137, The Code, was enacted in 1967. See 1967 Session, 62d G.A., ch. 163. He served on the board for six years. He explained the background and purpose of the 1968 regulation in light of his experience before and during that tenure.

Another former board member also testified. He was Franklin J. Kilpatrick, director of the environmental health service and associate professor in preventive medicine and environmental health in the College of Medicine at the University of Iowa. He said the board was motivated to enact the regulation by multiple risks to health existing in the Lake Macbride area because of the inability of evaporation and absorption to dissipate the strength of sewage, which would reach the lake, where it would not be effectively diluted. He said he believed the only satisfactory system to safeguard the public health is a central sewage disposal system. The board told Donald Kasparek this in July 1968. Kilpatrick testified that a central disposal system would actually be less expensive than private systems and is the only adequate answer to the health risk from septic tanks.

When the board was urged by plaintiffs, intervenors and others to relax the regulation on claims of hardship, the board obtained studies and recommendations which led it to reject proposals for change.

This record shows the board conscientiously and carefully weighed the public health interest against the individual economic interests of plaintiffs and intervenors and came down on the side of the regulation. In view of this record, I am unable to agree with the court's conclusion that the reasonableness of the regulation is not fairly debatable. I do not believe plaintiffs and intervenors showed the board acted irrationally in adopting it and making it applicable to existing subdivisions.

*II. The law.* Plaintiffs and intervenors rely on the due process and takings clauses of the United States and Iowa Constitutions. *See* U.S.Const. amends. V, XIV; Iowa Const. art. I, §§ 9, 18. These same provisions were involved in *Woodbury County Soil Conservation District v. Ortner.* *See* 279 N.W.2d at 277–78. We stated and applied the following principles of constitutional adjudication in that case:

1. "In considering the constitutionality of legislative enactments, we accord them every presumption of validity and find them unconstitutional only upon a showing that they clearly infringe on constitutional rights and only if every reasonable basis for support is negated." *Id.* at 277.

2. When a taking occurs, compensation must be given; when police power is exercised to control and regulate property for the public good, no compensation need be paid. The point at which police power regulation becomes so oppressive it amounts to a taking depends on the circumstances of each case. The test is whether the collective benefits to the public outweigh the specific restraints on the individual. Factors of importance include the economic impact of the regulation on the individual and, particularly, " 'the extent to which the regulation has interfered with distinct investment backed expectations.' " The character of the government action is also important. *Id.* at 278 (quoting with approval from *Penn Central Transportation Co. v. New York City*, 438 U.S. 104, 124, 98 S.Ct. 2646, 2659, 57 L.Ed.2d 631, 648 (1978)).

3. An exercise of the police power is not invalid merely because it imposes an extra financial burden on individuals. "A law does not become unconstitutional because it works a hardship. . . . The argument that one must make substantial expenditures to comply with regulatory statutes does not raise constitutional barriers." *Id.* at 279.

The landowners in *Ortner* challenged section 467A.44, The Code 1975, which was the basis for conservation district orders requiring them to implement certain soil erosion control practices on their farms within six months. Even with a state subsidy, the landowners' expense would be $12,000 in one case and $1,500 in the other. In addition, there were claims the process would remove substantial acreage from production, require additional equipment, reduce farm income, decrease the value of the land and bypass reasonable alternatives. Applying the relevant principles, this court unanimously held that the landowners did not meet their heavy burden to prove the statute violated the constitutions in the respects claimed. *Id.* at 279.

I believe a similar holding is compelled in the present case. The risk to public health apprehended by the board of health from pollution caused by septic tanks is more immediate and serious than the risk of soil loss in *Ortner*. The objective of the board was plainly reasonable. Moreover, the evidence was sufficient for a reasonable member of the board to conclude that the installation of a central sewage disposal system was an appropriate solution to the health risk and that the expedient of a five-acre limitation on the installation of septic tanks was the only tolerable exception. The question is not what this court in a de novo review of the evidence would say is an appropriate regulation; it is whether a rational board of health could reach the conclusion which the board did in this case. *See Carter Lake*, 241 N.W.2d at 901. The regulation is preventive. The fact that constant monitoring by percolation tests or nuisance actions after pollution occurs may be alternatives does not establish the irrationality of the means chosen by the board. *See id.* Exercise of the police power is not limited to remedial measures.

Principles in zoning cases relied on by the court do not show that the regulation amounts to a taking. In each of those cases the "vested right" was an "investment backed expectation" which would be totally and inevitably destroyed by the enactment. *See, e. g., Keller v. City of Council Bluffs*, 246 Iowa 202, 212–13, 66 N.W.2d 113, 119 (1954) ("The theory of vested rights relates only to such rights as an owner of property may possess not to have his property rezoned after he has a building permit and has started his construction or improvement. The rationale of such cases is that he has incurred obligations or liabilities for the work which he could not escape, and of these costs he would be deprived by such a rezoning."). Thus, in *Carter Lake* the denial of a landfill permit would have deprived the owner of the right to operate a landfill the town had previously authorized. Similar total and inevitable losses were involved in *Stoner McCray System v. City of Des Moines*, 247 Iowa 1313, 78 N.W.2d 843 (1956), and *Board of Supervisors v. Paaske*, 250 Iowa 1293, 98 N.W.2d 827 (1959). As in *Penn Central, Goldblatt* and *Ortner*, the proof of alleged oppressiveness does not measure up to this standard in the present

case. Furthermore, it is difficult to see how plaintiffs could make a "vested rights" claim as to their second subdivision when they knew the board of health's position before they obtained approval of their second plat. *See Huff v. City of Des Moines*, 244 Iowa 89, 56 N.W.2d 54 (1952).

Even when proved, a reduction in value of property is not necessarily a taking. *See Pennsylvania Coal Co. v. Mahon*, 260 U.S. 393, 413, 43 S.Ct. 158, 159, 67 L.Ed. 322, 325 (1922) ("Government could hardly go on if to some extent values incident to property could not be diminished without paying for every such change in the general law."); *Ortner*, 279 N.W.2d at 277–79. This is well illustrated by *Carter Lake*. A permit requirement that would destroy the right to operate a landfill which the town had granted by lease was invalidated as a taking. However, stringent new regulations on the manner of operating the existing landfill were upheld.

The United States Supreme Court has upheld exercises of police power which allegedly resulted in substantially reduced property values. *See Village of Euclid v. Ambler Realty Co.*, 272 U.S. 365, 47 S.Ct. 114, 71 L.Ed. 303 (1926) (75 percent); *Hadacheck v. Sebastian*, 239 U.S. 394, 36 S.Ct. 143, 60 L.Ed. 348 (1915) (87½ percent). In *Ortner* we followed the analogous holding in *Penn Central Transportation Co. v. New York City*, 438 U.S. 104, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978).

Only five months after *Goldblatt* was decided, the Supreme Court had before it an appeal from a decision upholding a zoning ordinance which the trial court and California Supreme Court had agreed completely destroyed the economic value of the appellant's land. The takings issue was squarely presented, but the Court dismissed the appeal for want of a substantial federal question. *See Consolidated Rock Products Co. v. Los Angeles*, 57 Cal.2d 515, 370 P.2d 342, 20 Cal.Rptr. 638, *appeal dismissed for want of substantial federal question*, 371 U.S. 36, 83 S.Ct. 145, 9 L.Ed.2d 112 (1962); Sax, *Takings and the Police Power*, 74 Yale L.J. 36, 43–44 (1964). We have recognized that

such dismissals are on the merits and thus binding on us. *See Beitz v. Horak*, 271 N.W.2d 755, 758 (Iowa 1978). Under this authority, even if the regulation in the present case did deprive plaintiffs and intervenors of profitable use of their lots, the federal constitutional standard was not breached.

The relevant principles have recently been reaffirmed in *Andrus v. Allard*, —— U.S. ——, ——, 100 S.Ct. 318, 326–27, 62 L.Ed.2d 210, 222–24 (1979). The analysis in *Allard* is apposite to the present case. It involved a takings challenge to an Interior Department regulation which the Court found had the effect of barring the sale of eagle parts which had been obtained prior to the effective date of the authorizing statute. The Court reiterated the principles which had been announced in prior cases, pointing out: "[G]overnment regulation—by definition—involves the adjustment of rights for the public good. Often this adjustment curtails some potential economic use or economic exploitation of private property. To require compensation in all such circumstances would effectively compel the government to regulate by *purchase.*" *Id.* at ——, 100 S.Ct. at 326, 62 L.Ed.2d at 222. After noting that the regulations did not require the surrender of the artifacts or involve a physical invasion or restraint upon them, and despite what the Court called the "undeniable" fact that the regulations prevented the owners from making the most profitable use of their property, the Court held that the prohibition against sale did not effect a taking. *Id.* at ——, 100 S.Ct. at 327–28, 62 L.Ed.2d at 223–24. The present case comes well within the *Allard* principles.

I would hold that plaintiffs and intervenors failed to meet their burden to show that the 1968 regulation denies them due process or constitutes a taking.

REES, UHLENHOPP, and HARRIS, JJ., join this dissent.