F. H. UELNER PRECISION TOOLS & DIES, INC., et al., Appellees,

v.

CITY OF DUBUQUE, Iowa, Appellant.

No. 54598.

Supreme Court of Iowa.

Sept. 27, 1971.

R. N. Russo, Dubuque, for appellant.

Kintzinger, Kintzinger, Van Etten & Setter, Dubuque, for appellees.

Reynolds, Kenline, Roedell, Breitbach & McCarthy, Dubuque, amicus curiae.

UHLENHOPP, Justice.

The question in this appeal is whether plaintiffs' real estate can be rezoned upward to multiple dwelling uses in furtherance of the city's general development plan.

The inner city of Dubuque, Iowa, contains, among others, the Washington Street area. The part of that area with which we are concerned comprises a little over 17 blocks, and is surrounded largely by commercial and light industrial areas and by railroad yards. Many years ago that part of the area was built up with modest homes, three churches, and a parochial school. The neighborhood did not improve with passage of time and the buildings aged. Small business and industry moved in at various places, mostly in the north part of the area. At present about 23 of these firms exist. Overall the area is about 90% residential. Today, residential improvement and construction in the area is substantially stationary but some commercial or light industrial construction or improvement occurs from time to time.

In 1934 Dubuque adopted a comprehensive zoning ordinance. At that time the potential of the Washington Street area was thought to be for light industry, due to the proximity of the railroads. Consequently, the area was zoned light industrial except for a small part which was zoned commercial.

As time passed, however, railroad transportation declined and truck and other forms of transportation increased. The Washington Street area did not develop industrially as expected.

Prior to 1965, the city council decided to obtain a general development plan for the city and environs. See Code, 1971, ch. 373. The council employed Victor Gruen Associates, a firm specializing in such work, which conducted an extensive survey of the whole region and developed a long-range plan. In 1965 the council adopted the plan as the official one.

At that time, most retail trade was conducted in the downtown business district, near the Washington Street area. The general development plan designated that district as the future business section. Afterward a large shopping center was built in the west part of the city. The evidence does not indicate what effect this may have on the downtown business district as the main business section of the future.

The master plan designated the Washington Street area as an apartment district for high-density population. The present buildings would be razed, and the area would have a large park in the center and open spaces at other places. Several streets in the area would be vacated, and through traffic would be routed around on a thoroughfare separating the area from the railroad yards. Thus implemented, the plan would obviously transform Washington Street into an attractive area indeed.

In 1967, people residing in the Washington Street area, looking toward improvement of the area, began holding meetings. They learned that the area was then zoned light industrial and commercial. They therefore petitioned the city council to change the zoning to multiple housing, consistent with the general development plan. The area covered by their petition was extensive. About 79% of the property owners in the area, plus some tenants, signed the petition, which they then presented to the council.

The council referred the petition to the planning and zoning commission for study and recommendation. See Code, 1971, § 414.6. That body studied the proposal and re-examined the general development plan. It concluded that the general development plan was still valid and that the proposal was consistent with the plan. The commission believed that several methods could be employed to achieve the objective of the plan for Washington Street: public investment and subsidy, private investment, neighborhood improvement efforts, building code enforcement, and land use controls including zoning. The petition dealt only with zoning.

Thus the commission saw zoning as but one of the methods to be used for Washington Street. But the commission was troubled by the proper role of zoning in the circumstances. Most of the area covered by the petition was residential, but part of it was in fact devoted to commercial and light industrial uses, especially in the north part, and the owners of those enterprises had developed them and invested funds on the basis of existing zoning. The commission reported to the council:

Experience has generally indicated that zoning can be used to initiate a trend in redevelopment from a restricted use to a less restricted use and that it can be used to stabilize an existing pattern, but that it is not effective in causing a trend from less restricted uses to more restricted uses. In fact, it can cause a deterioration of those uses that are made non-conforming and in some instances cause them to be a more blighting influence than previously.

The commission balanced the probable public benefit from rezoning the whole area against the hardship which would likely result to the commercial and light industrial establishments, and concluded that the former did not outweigh the latter. It therefore recommended approval of the petition but limited to an area of approximately 12 blocks which was largely residential, and in so doing said:

It was the opinion of the Commission that in considering only a change in zoning and no other action that it was difficult to show a strong public benefit to offset the hardship that would be created for those owners of commercial and industrial uses where there were several non-residential uses in proximity.

The council received the report, held hearings, and after full consideration passed an amending ordinance altering the permissible use to multiple dwelling. But the council changed the area covered by the amending ordinance to considerably less than petitioned for although more than recommended by the commission. The council included about six and one-half blocks not approved by the commission for multiple dwelling, in which 17 commercial or light industrial enterprises were located. Of those 17 enterprises, 14 were in the north part of the rezoned area. Plaintiffs are ten owners and one tenant operating businesses or light industries in that north

part. The largest of them is Dubuque Casket Company, which has manufactured caskets at its present location since 1892. It has a four-story building covering almost a half-block.

The rezoning from commercial or light industrial to multiple dwelling caused an immediate decrease in the value of plaintiffs' properties, for one day those properties conformed to zoning and the next day they were nonconforming uses. Moreover, gradual deterioration of plaintiffs' properties may well occur, as the commission indicated. The rezoning is not retroactive, so plaintiffs can continue to utilize their properties as permissible nonconforming uses. But Article IX of the general zoning ordinance prohibits a structure constituting a nonconforming use from being repaired or improved at a cost exceeding 50% of its assessed value—about 13% or 14% of market value—on pain of losing its status as a permissible nonconforming use. See Granger v. Board of Adjustment, 241 Iowa 1356, 44 N.W.2d 399; Annot., 64 A.L.R. 920. No one can gainsay the general conclusion of the city zoning and planning commission that the rezoning will work hardship on plaintiffs.

After trial, the trial court arrived at substantially the same conclusion as the zoning and planning commission. It decided that inclusion of plaintiffs' properties in the rezoning could not be justified, and this, it believed, compelled it to strike down the entire amending ordinance. The city appealed.

As the commission and the trial court realized, ultimately the question is whether the hardship upon plaintiffs is overborne by the public good resulting from inclusion of their properties in the rezoned area. Another question in the case is whether the rezoning ordinance stands or falls as a whole.

I. *Balancing the Interests.* The case involves the role of zoning in the fulfillment of long-range city planning. Traditionally, zoning has been employed as a holding action to prevent deterioration of districts, and amendments have usually rezoned districts "down" rather than "up." In the present instance the rezoning was up, not down. It was a holding action as to the largely residential 12 blocks, recommended for inclusion by the commission to prevent further incursion of commerce and industry. But the rezoning cannot be expected to stabilize the six and a half blocks already having several businesses and industries. More likely those structures will decline. Unquestionably the rezoning was a proper use of zoning to stabilize the portions largely residential. That portion did not develop industrially because of changes in transportation methods. 8 McQuillin, Municipal Corporations, § 25.106 at 295–96 (3d ed.) (may rezone from industrial to residential where the land through "erroneous opinion as to future development has been included in an industrial or business district and it has become apparent that the area should be zoned as residential"); Brackett v. Des Moines, 246 Iowa 249, 67 N.W.2d 542. Our problem relates to the portion which did in fact develop commercially and industrially as originally hoped.

In principle, zoning of land for the public good is a proper exercise of the police power even though it works some onerous consequences on landowners. Euclid v. Ambler Realty Co., 272 U.S. 365, 47 S.Ct. 114, 71 L.Ed. 303; Des Moines v. Manhattan Oil Co., 193 Iowa 1096, 184 N.W. 823. But the power to zone is not unlimited. It must be reasonably exercised, in furtherance of the public safety, health, morals, and welfare. Granger v. Board of Adjustment, 241 Iowa 1356, 44 N.W.2d 399. Unfortunately, no precise test exists for determining exactly whether particular zoning restrictions pass muster. Rather, each case must be judged on "whether the means employed in the attempted exercise of the police power have any real, substantial relation to the public health, comfort, safety, and welfare, including the maintenance of property values." Plaza Recreational Center v. Sioux City, 253 Iowa 246, 253, 111 N.W.2d 758, 763. The modern tend-

ency is " 'to uphold zoning regulations which formerly would have been rejected as arbitrary or oppressive. * * * ' " Id. at 254, 111 N.W.2d at 763. If the question is "fairly debatable," the zoning stands. Euclid v. Ambler Realty Co., 272 U.S. at 388, 47 S.Ct. at 118, 71 L.Ed. at 311. Initially, a strong presumption of validity accompanies zoning ordinances. Hanna v. Rathje, 171 N.W.2d 876 (Iowa).

■ Zoning is not static and cities may rezone territory, subject however to the same limitations which attend original zoning. As stated in Keller v. Council Bluffs, 246 Iowa 202, 207–208, 66 N.W.2d 113, 116, "[T]he governing body of a municipality may amend its zoning ordinances any time it deems circumstances and conditions warrant such action, and such an amendment is valid if the procedural requirements of the statutes are followed and it is not unreasonable or capricious nor inconsistent with the spirit and design of the zoning statute." See too Hanna v. Rathje, supra; Anderson v. Cedar Rapids, 168 N.W.2d 739 (Iowa).

Coming to our specific situation, the residents of the Washington Street area who favor rezoning, and the city council with them, have a worthy objective in beginning the long-range task of upgrading the area. The projected development as a light industrial area did not come to pass. The master plan if carried out will make the area an attractive one for urban living. Zoning will probably be one effective tool for holding the residential portion from further commercial and industrial inroads until other renewal efforts can be undertaken.

■ But the northern portion of the area involving several businesses and light industries in proximity to each other presents a different case. Some of these firms have been there many years. A number of the properties represent very substantial investment. None of the activities of the firms is shown to be offensive—other than the fact itself of being commercial or indus-

trial. The founders established those firms when the area was unzoned or in reliance on then existing zoning. Rezoning will work hardship. Moreover, rezoning will not likely stabilize that portion of the area but, if anything, will have a deteriorating influence. We do not have here a relatively few or isolated nonconforming uses compared to the area as a whole, as in Dubin v. Wich, 120 N.J.L. 469, 473, 200 A. 751, 753. The court there said, "The existence of nonconforming business uses in a relatively small portion of an area reasonably and naturally comprising a residential unit, does not serve to disable the municipality from so classifying the whole." Rather, the north part of this area is quite substantially commercial and industrial. On balancing the possible public good against the harm to plaintiffs, we arrive at the conclusion reached by the commission and the trial court. We hold the rezoning unreasonable as applied to plaintiffs' properties. Langguth v. Mount Prospect, 5 Ill.2d 49, 124 N.E.2d 879; McGiverin v. Huntington Woods, 343 Mich. 413, 72 N.W.2d 105; Ritenour v. Dearborn, 326 Mich. 242, 40 N.W.2d 137.

This does not mean that the city's master plan cannot be achieved; it means only that various other methods will be necessary under some circumstances to accomplish that end. The Gruen long-range plan and the commission's recommendation on this particular rezoning recognize that several methods will have to be utilized, including the infusion of public funds for investment and subsidy. The city may eventually find condemnation necessary. Annot., 44 A.L.R.2d 1414. Zoning, however, cannot be used as a substitute for eminent domain.

II. *Partial Invalidity.* Due to the invalidity of the rezoning ordinance as applied to plaintiffs' properties, the trial court thought the whole amending ordinance fell. But broad zoning ordinances not infrequently have invalid applications, yet the ordinances as a whole ordinarily do not fall. The principle is stated thus in 8 Mc-

Quillin, Municipal Corporations, § 25.63 at 162–63 (3d ed.):

> The rule that an ordinance may be invalid in a particular but not all applications is applicable with respect to zoning ordinances. In other words, the ordinance may be void in its regulations as applied to certain property and valid as applied to other property.

> Zoning regulations, like other ordinance provisions, may operate unreasonably in some instances and reasonably in others. Thus, a zoning ordinance, reasonable in general, may be unreasonable in its application to particular property. Indeed it is said repeatedly by the courts that the constitutionality and validity of zoning must be determined according to the facts and circumstances of the particular case, and this is true relative to the reasonableness of such ordinances.

See also 58 Am.Jur. Zoning § 15 at 949; 101 C.J.S. Zoning § 23 at 723.

■ We think the rule of partial invalidity—invalidity as applied to plaintiffs' particular properties—is especially appropriate here. Plaintiffs' properties can be deleted without violence to the rezoning as applied to the rest of the area. Too, the general zoning ordinance, of which the rezoning ordinance became a part by amendment, contains a severability clause in Article XVIII.

We therefore only hold that the rezoning ordinance is invalid with respect to plaintiffs' properties which were used, when such ordinance was adopted, for commercial or light industrial purposes. The decree of the district court is modified accordingly.

Modified and affirmed.

All Justices concur except BECKER, J., who takes no part.