David **KENT**, Individually, and as Next Friend of 'Holmes,' Appellant,

v.

**POLK COUNTY BOARD OF SUPERVISORS, Polk County Board of Health, and Polk County Board of Health Advisory Committee, Appellees.**

No. 85–1006.

Supreme Court of Iowa.

July 23, 1986.

Rehearing Denied Aug. 20, 1986.

Dominic Corsello of Prine & Corsello, Des Moines, for appellant.

Charles R. Montgomery, Asst. Co. Atty., Des Moines, for appellees.

Considered by REYNOLDSON, C.J., and HARRIS, SCHULTZ, CARTER, and WOLLE, JJ.

REYNOLDSON, Chief Justice.

In this case the interests of David Kent, owner of an African lion kept as a pet, collide with a Polk County ordinance regulating the possession of "dangerous and vicious animals." Kent was denied a permit to keep the animal under the provisions of the ordinance. This denial was upheld in a certiorari action brought in district court, and Kent has appealed. We affirm.

Kent acquired the lion, "Holmes," in 1982 when it was three weeks old, and has cared for it at his Polk County home since that time.

In September 1984 the Polk County board of supervisors (board) adopted an "Ordinance Regulating Dangerous and Vicious Animals" (ordinance). This ordinance prohibits persons from owning, sheltering, harboring, or keeping certain species of animals in Polk County, Iowa, with exceptions for those who can qualify for a permit. Permits may be obtained to keep such animals for research, education, or reproduction purposes as those terms are defined in the ordinance and associated rules and regulations, also adopted by the board. The ordinance includes lions on its list of dangerous animals. Therefore, a person is barred from sheltering such an animal un-

less he or she can come within an exception to the prohibition.

Section 4 of the ordinance provides that the prohibition does not apply to public zoos, humane societies, education or medical institutions, circuses, carnivals, animal hospitals, wildlife rescue organizations, licensed game breeders, and the federal, state, or county governments. Finally, rule 4(H)(1)(b)(4) provides:

> *Permits are not to be issued to persons who merely wish to possess a "dangerous animal" as a pet.* The Director shall, therefore, deny a permit to applicants, who in the Director's ... opinion, have merely contrived a "research," "education," or "reproduction" purpose to justify possession of a "dangerous animal" as a pet. However, such a denial shall not be based upon a mere suspicion alone; there must be articulable evidence to support such an opinion.

(Emphasis added.)

There is no dispute that Kent has kept Holmes as a pet. She is in good health, has been declawed, and has had proper care and veterinary attention. The lion is maintained in a secure holding facility that measures ten by twelve by six feet. Kent has plans, if granted a permit, to build a new facility measuring twenty-four by thirty feet, with an additional, circular, outside steel enclosure.

The ordinance became effective January 1, 1985. On January 17 the Polk County physical planning department (department) served Kent with a "Notice to Remove." Kent was given three days to apply for a permit, or seven days to place Holmes with a person, organization, or entity allowed to have such an animal, or to "euthanise" her in a "humane manner."

January 22, 1985, Kent applied in writing for a permit, asserting he was keeping the lion as a pet. The department denied this application. Its notice of denial was accompanied by an explanatory letter stating that keeping the animal as a pet was not a valid basis for a permit, the holding facility was inadequate, and Kent did not demonstrate a special ability to handle the lion.

Kent appealed to the Polk County board of health advisory committee (committee) as provided by the ordinance. When the matter came on for hearing, Kent presented a written statement and exhibits. After de novo consideration of the entire record, the committee denied Kent's application. The committee reasoned he had failed to state a permissible purpose for issuing a permit and the proposed facility was inadequate.

Kent's petition for writ of certiorari, filed in district court, alleged the committee had exceeded its jurisdiction and acted illegally in denying his application for a permit. Following a trial the district court annulled the writ, holding the committee did have jurisdiction to act and had acted legally. In this appeal Kent raises a number of jurisdictional, constitutional, and substantive issues. We discuss these in the divisions that follow.

I. *Did the committee have jurisdiction to act on Kent's application?*

Kent first argues the committee was without jurisdiction to hear his appeal. More specifically, he contends his appeal involved a matter of public health, and thus, jurisdiction was vested solely in the county board of health pursuant to Iowa Code section 137.5.

Each county has home rule power to determine its local affairs. Iowa Const. art. III, § 39A. Further, the power of each county is vested in its board of supervisors. Iowa Code § 331.301(2) (1985). Consequently, if not limited by the constitution or inconsistent with state law, a board may

> exercise any power and perform any function it deems appropriate to ... *preserve and improve the peace, safety, health, welfare, comfort, and convenience of its residents.*

*Id.* § 331.301(1) (emphasis added). The board can exercise this broad power by passing an ordinance. *Id.* § 331.302(1).

Here, under its home rule power, the board passed an ordinance to ban "dangerous animals." In doing so, it designated the committee as the body vested with

jurisdiction to hear appeals under the ordinance. This designation does not violate the statutory mandate in Iowa Code chapter 137, as Kent suggests.

Kent correctly asserts a board of health has the power to enforce state health laws, *id.* § ·137.6(1), and to make rules for the "protection and improvement of the public health," *id.* § 137.6(2). These rules, however, become effective only upon approval by the county board of supervisors. *Id.* In addition, this board, in adopting the ordinance and providing for appeal to the committee, did nothing to interfere with the Polk County board of health's ability to propose rules or otherwise carry out its duty. The local board of health has no statutory mandate to hear appeals on the issues involved in this ordinance and there was no encroachment on its jurisdiction.

Moreover, the board clearly has the power to enact ordinances to protect the public "peace, safety, health, welfare, comfort, and convenience." *Id.* § 331.301(1). Ordinances regulating animals often are enacted pursuant to the county's duty to protect the public, especially the public safety. *See* 4 C. Antieau, *Antieau's Local Government Law: County Law* § 35.03 (1986). Finally, the board could delegate the review process to the committee. *See* Iowa Code § 331.301(2) ("[A] duty of a county shall be performed *by or under the direction* of the board. . . .") (emphasis added).

Alternatively, Kent argues the committee cannot claim derivative power from the Polk County board of health because the latter body is comprised illegally. No member of the health board was a licensed physician as required by Iowa Code section 137.3.

The committee, however, derives its power to hear appeals from the board, not the health board. Further, the record reflects the board was acting as the health board at all relevant times here, pursuant to legislative authorization. *See* 1980 Iowa Acts ch. 1001, § 20. The legislature, in authorizing a county board of supervisors to appoint itself as the health board, did not require

the board of supervisors to have a physician among its members.

We hold the committee had jurisdiction to hear Kent's appeal.

II. *Is the ordinance irreconcilable with Iowa Code section 110.23 and therefore unconstitutional?*

Kent asserts the ordinance is irreconcilable with Iowa Code section 110.23 and therefore invalid. *See* Iowa Code § 331.-301(1), (4). As we noted in division I, however, a county, under home rule, has "the power to enact an ordinance on a matter which is also the subject of statute if the ordinance and statute can be harmonized and reconciled." *City of Council Bluffs v. Cain,* 342 N.W.2d 810, 812 (Iowa 1983); *see Green v. City of Cascade,* 231 N.W.2d 882, 890 (Iowa 1975).

Iowa Code section 110.23 provides:

> *Any person may possess not more than two game birds or fur-bearing animals confined as pets* without being required to purchase a license as a game breeder, but the person shall not be allowed to increase the person's stock beyond the original number nor shall the person be allowed to kill or sell such stock. Game birds or animals confined as authorized in this section must be obtained from a licensed game breeder or a legal source outside of this state.

(Emphasis added.) Kent asserts this Code section specifically authorizes citizens to keep fur-bearing animals, such as lions, as pets. Consequently, he argues the ordinance providing that "dangerous" animals may not be kept as pets is irreconcilable with state law and cannot stand.

■ The district court rejected Kent's argument, as we do now. We remain unconvinced that the legislature intended the term "fur-bearing animals" to include African lions. Although generally we give the ordinary meaning to the words in a statute, we will not permit the literal meaning to prevail over or frustrate the legislative intent. *Welp v. Iowa Department of Revenue,* 333 N.W.2d 481, 483 (Iowa 1983). A workable and practical construction must

be given to the language. *In re Marriage of Cernetisch*, 376 N.W.2d 598, 599 (Iowa 1985). We view statutes dealing with the same subject matter together. *Id.* at 600.

Iowa Code section 110.23 exempts certain persons possessing fur-bearing animals from a licensing requirement contained in section 110.1. The latter section prohibits a person from possessing a wild animal, "the protection and regulation of which is desirable for the *conservation of the resources of the state*," without first obtaining a license. Iowa Code § 110.1 (emphasis added). Section 110.1, therefore, is focused on the resources of our state, which do not include lions from Africa. Our view that these sections are intended to conserve Iowa wildlife finds support in an opinion of the Iowa Attorney General. *See* 1944 Op. Iowa Att'y Gen. 167–68.

We hold there is no irreconcilable conflict between the ordinance and state law, and trial court rightly held the ordinance was not unconstitutional on this ground.

III. *Did the committee abuse its discretion in ruling the ordinance provided a mandatory prohibition against issuing a permit for sheltering a "dangerous animal" as a pet?*

Relying on the rules adopted by the board to enforce the ordinance, the committee found there was a mandatory prohibition against issuing permits for pet purposes, and it thus had no discretion in the matter. Kent argues the committee did have such discretion and abused the discretion by failing to exercise it.

The argument is without merit. Rule 4(H)(1)(b)(4) clearly states that "[p]ermits *are not* to be issued to persons who merely wish to possess a 'dangerous animal' as a pet." (Emphasis added.) The prohibition is mandatory.

The director or body reviewing the permit application does have some discretion in determining whether the assertion of a permissible purpose is in fact bona fide. The rule states that the "evaluation in this respect shall be *guided by* the following definitions [of research, education, and re-

production,] and considerations." (Emphasis added.) Kent focuses on the words "guided by" in arguing the committee had the discretion to issue a permit that would allow him to keep Holmes as a pet.

In construing ordinances, as with statutes, we do not give undue importance to any single portion. *See Cernetisch*, 376 N.W.2d at 600. We give a practical construction to the legislative enactment and view the enactment as a whole. Viewing rule 4(H) as a whole, it is clear the words "guided by" only give the issuing body discretion in determining if the asserted permissible purpose was bona fide. The discretion did not allow the committee to expand the permissible purposes to include pets.

Kent further contends the mandatory prohibition illegally discriminates against him. He asserts a person who obtained a research permit could possibly keep the animal for a pet after the research concluded. Kent points to the rules on revocation, which state the permit "may" be revoked upon the occurrence of certain events, not that it "must" be revoked.

This argument ignores the plain language of rule 4(H)(5), which states:

The "Permit" shall expire twelve (12) months from the date of issuance or *upon completion of the "research,"* "education," or "reproduction" purpose for which the "Permit" was issued, whichever is sooner.

(Emphasis added.) The rule does not illegally discriminate against Kent.

IV. *Did the ordinance violate the equal protection clause?*

Nor are we persuaded by Kent's argument that the ordinance violates the equal protection clause by treating persons who wish to possess a lion as a pet differently than those who wish to possess a lion for research, education, or reproductive purposes.

Because no fundamental right or suspect class is involved in Kent's challenge, the proper level of scrutiny is rational basis.

The challenged classification must be sustained

unless the challenging party can demonstrate that it is patently arbitrary and bears no rational relationship to a legitimate governmental interest. Under the rational basis test, a legislative classification is upheld if any conceivable state of facts reasonably justify it.

*Bishop v. Eastern Allamakee Community School District*, 346 N.W.2d 500, 505 (Iowa 1984) (citation omitted).

■ Kent failed to meet this heavy burden. The ban on private ownership of "dangerous animals" is rationally related to the board's duty to promote the public safety and welfare. Moreover, the board's distinction between holding these animals as pets and holding them for other purposes is rationally related to the legitimate goal of public safety. The board could reasonably determine the benefit to society gained from limited exceptions for research, education, and reproduction of endangered species outweighs the threat to public safety. Similarly, the board could determine the same societal benefit cannot be derived from individual pet ownership, and therefore, such ownership does not outweigh the potential threat to public safety.

V. *Did the committee abuse its discretion or act arbitrarily, capriciously, and unreasonably in denying the permit based on the current or proposed facility?*

As an alternative ground for its decision, the committee found Kent's proposed facility failed to meet the 2500 square feet minimum requirement in the rules. Kent contends the committee acted arbitrarily and capriciously in making this ruling, and abused its discretion.

As the district court noted, the committee's jurisdiction was limited. Neither the ordinance nor the rules gave the committee authority to review the minimum space requirements. The committee was only to see that the standards were applied properly. The committee did not act arbitrarily or capriciously and did not abuse its discretion in determining that Kent failed to meet the minimum space requirements.

Kent also asserts the board was arbitrary in setting the 2500 square feet requirement. The trial testimony indicated that professionals in the animal and zoo area are not in agreement about the need for minimum requirements and what those requirements should be. Because we already have found the committee was justified in denying the permit on another ground, this contention is moot and we are not required to address it.

VI. *Did enforcement of the ordinance violate Kent's due process rights?*

We reject Kent's claim that enforcement of the ordinance violated his procedural due process rights. He had both notice and opportunity to be heard. *See Bishop,* 346 N.W.2d at 506–07.

Nor do we find any violation of substantive due process. The standard for reviewing a due process challenge is well established.

There is no dispute about the rule that, to be constitutional, an ordinance must have a definite, rational relationship to a legitimate purpose. ...

A party who challenges an ordinance has the burden of proving it unconstitutional, and must negate every reasonable basis upon which the ordinance may be sustained. This means that the challenger has the burden of producing the evidence, and persuading the court, of the ordinance's lack of rational nexus with its supposed purpose.

....

... If reasonableness of the ordinance's nexus to its purported end is fairly debatable, it must be allowed to stand.

*Cain,* 342 N.W.2d at 813 (citations omitted).

It is clear this ordinance was enacted to promote and protect the public health, safety, and welfare: a legitimate governmental purpose. *See* ordinance rule 1 ("The foregoing paragraph should not be interpreted in a manner that will frustrate efforts to

protect the life of a human being threatened by a 'dangerous animal'...."); *City of Warren v. Testa*, 461 N.E.2d 1354, 1356 (Ohio Ct.Cm.Pleas 1983) ("Once a lion becomes full grown, it is so big, strong, and *potentially* dangerous, that it should not be kept in a home." (emphasis in original)); *cf. Town of Atlantic Beach v. Young*, 307 N.C. 422, 427–29, 298 S.E.2d 686, 690–91 (A city ordinance that prohibited the sheltering of animals other than house pets within the city limits was reasonably related to the public welfare.), *appeal dismissed*, 462 U.S. 1101, 103 S.Ct. 2446, 77 L.Ed.2d 1328 (1983).

■ Kent acknowledges the ordinance was enacted to promote public safety, but maintains that an outright ban of ownership of lions for pets is arbitrary. He points out that the board made no provision to consider the facts of each case. Here, Kent acquired his lion several years before this ordinance was enacted, and produced proof that he is responsible in caring for Holmes and in securing her confinement facilities.

The board, however, need not select the least restrictive alternative in regulating animals. It need only employ the means that are reasonably related to the public safety and welfare. The board did so here. We cannot substitute our judgment for the legislative authority's judgment, because the latter body is directly responsible to the public it must protect. The ordinance does not violate due process.

VII. *Does enforcement of the ordinance constitute a "taking" without just compensation?*

Finally, Kent asserts application of this ordinance constitutes a taking of his property without just compensation. The ordinance was enacted pursuant to the county's police power. We have long distinguished between eminent domain and the police power.

> "Eminent Domain" is the taking of private property for a public use for which compensation must be given. On the other hand "Police Power" controls and regulates the use of property for the

public good for which no compensation need be made.

*Hinrichs v. Iowa State Highway Commission*, 260 Iowa 1115, 1126, 152 N.W.2d 248, 255 (1967); *see Woodbury County Soil Conservation District v. Ortner*, 279 N.W.2d 276, 278 (Iowa 1979); *Iowa Natural Resources Council v. Van Zee*, 261 Iowa 1287, 1294, 158 N.W.2d 111, 116 (1968).

■ A regulation purportedly enacted under the police power can be so oppressive that it constitutes a taking, and compensation is required. *See Ortner*, 279 N.W.2d at 278. To discover whether the ordinance goes beyond the scope of the police power, we determine if the societal benefits arising from the regulation outweigh the specific restraint or burden placed on the individual. *Id.; Van Zee*, 261 Iowa at 1294, 158 N.W.2d at 116. Thus, we consider the nature of the public interest involved and the impact of the restraint. Important factors include the regulation's economic impact on the owner and the extent to which it interferes with distinct investment-backed expectations. *Ortner*, 279 N.W.2d at 278.

In this instance safety is the important public interest. The public benefits as a whole when protected from potentially dangerous animals. Kent is part of the public and shares in that benefit.

■ We do not ignore the hardship this ordinance causes Kent. We find as the Ohio court did in *Testa:* This owner genuinely loves his pet. He has raised Holmes from the time she was a three-week-old lion cub. Kent's expert witness testified a definite bond exists between Kent and Holmes. Nevertheless, Kent is free to move from Polk County with Holmes or otherwise place Holmes with an acceptable organization. The board is not depriving this owner of his property. We find that the societal benefit arising from this regulation outweighs the burden on Kent. Although he claims a substantial investment in Holmes, largely by way of food, veterinary care, and shelter, Kent does not claim the ordi-

nance interferes with a distinct investment-backed expectation.

The ordinance was a valid exercise of police power and does not constitute a taking. *Cf. Loftus v. Department of Agriculture,* 211 Iowa 566, 232 N.W. 412 (1930) (Destruction of diseased cattle did not constitute a taking.), *appeal dismissed,* 283 U.S. 809, 51 S.Ct. 647, 75 L.Ed. 1427 (1931).

We affirm the district court ruling that annulled the writ of certiorari.

AFFIRMED.