Wayne **KEMPF**, Kenneth L. **Albrecht**, **Governor-Dodge Street Rentals**, and **Earl Yoder Construction Co.**, Appellees,

v.

**CITY OF IOWA CITY**, Iowa, Appellant.

No. 85–1876.

Supreme Court of Iowa.

March 18, 1987.

Rehearing Denied April 9, 1987.

Richard J. Boyle, Asst. City Atty., Iowa City, for appellant.

Ronald W. Wendt, Cedar Rapids, for appellees.

Considered by REYNOLDSON, C.J., and HARRIS, WOLLE, LAVORATO, and NEUMAN, JJ.

REYNOLDSON, Chief Justice.

The unusual circumstances of this case require us to mark the obscure line that sometimes protects a landowner's right to hold and utilize property against a city's power to change zoning regulations. Except when it is necessary to distinguish them, we refer to plaintiffs Wayne Kempf, Kenneth L. Albrecht, Governor-Dodge Street Rentals, and Earl Yoder Construction Co. collectively as Kempf.

Kempf purchased a four-acre tract in Iowa City, zoned for office buildings and high density, multi-family residential housing. Relying on a city study concluding such uses should be expanded in the area, Kempf substantially improved the tract and constructed an office building and the first of five apartment structures. The city then rezoned the remaining area so that the planned improvement could not be completed. Kempf brought action challenging the rezoning. Trial court, sitting in equity, invalidated the ordinance as applied to the Kempf property, and restored the former zoning. The city has appealed that decision. We affirm in part, reverse in part, and remand to the district court.

This case was tried in equity and decided under equitable principles. Thus we treat the proceeding as equitable in nature and our review is de novo. *See* Iowa R.App.P. 4; *see also Stone v. City of Wilton*, 331 N.W.2d 398, 401 (Iowa 1983); *Incorporated City of Denison v. Clabaugh*, 306 N.W.2d 748, 751 (Iowa 1981). We give weight to trial court's fact-findings but we are not bound by them. Iowa R.App.P. 14(f)(7).

In our de novo review we find the following facts, which essentially are those found by the trial court. At the outset the property involved in this controversy comprised seven unimproved platted lots or parts of lots, zoned R3B, lying between North Dodge Street and North Governor Street in the near north side of Iowa City. In all, the property was approximately four acres in size. We find these lots probably were assigned a R3B intense zoning designation because their rugged and wooded terrain significantly increased the cost of development, making it economically unfeasible to develop them for less intense, relatively low income producing uses like single-family or duplex residential housing.

In about 1962 a comprehensive plan established for the near north side determined this was an area of deteriorating houses and the area should become more dense in population.

In January 1968 the city finalized and published "The North Side Study," the introduction to which proclaimed it included "statements which establish a 'policy framework' to guide development decisions, both public and private." The stated "basic purpose [of the report was] to formulate a body of policy to guide the development of the northern sector of the community," and it was specifically pointed out that "[m]any persons, particularly those directly involved in development, will appreciate knowing in advance where the City stands with regard to various development proposals."

With respect to the area of deteriorating housing and the vacant lots involved in this controversy, the study stated:

A "transition area" is proposed between North Governor Street and Dodge Street [to] be established by rezoning this area to R3 (*except for the area that is now zoned R3B*). This could provide an orderly transition from the older established residential areas to the newer areas and would promote the desirability of this area for gradual redevelopment.

(Emphasis added.)

Further,

Medium to high density housing is proposed for the older established area between North Governor and North Dodge Street[s]....

The use of planned area developments by developers will be encouraged. This is possible because of the present single ownership of large tracts of land in the study area.

Finally, the report proposed the medium-high density land use in the area be increased from 38 acres to 226 acres. An accompanying map disclosed the proposed land use of the subject property would be for medium to high density housing.

This North Side Study was made available for potential developers. Kempf did consult and rely on the study, as well as the R3B zoning, when he paid $65,000 for the property in May 1972 for high density residential development purposes.

In the year of purchase Kempf commenced extensive site development. He removed all trees and brush after determining there were no good trees on the premises. Storm sewerage, which had crossed the property in an open ditch, was replaced with a city-inspected storm sewer, including an eighteen-foot-deep catch basin to direct water into the system. Kempf also filled and graded the area, which had a twenty-foot fall and a deep ravine varying from ten to eighteen feet in depth. Water, sanitary sewer, and electricity were brought to the project. In all, Kempf invested a total of approximately $114,500 in land purchase price and preliminary site improvements.

The contemplated apartment construction was temporarily delayed when Kempf successfully bid on a lease to Johnson County of a social services building to be constructed on three of the small lots. This was a permitted R3B zone use. The city granted a building permit. The improvement was commenced in the fall of 1973 and completed in the spring of 1974. In 1985 the social services building had an assessed valuation of $308,738. At the time of this construction water, electricity,

sewer, and a storm sewer were extended to proposed locations for various apartment buildings to be constructed under the overall plan.

In 1974 Iowa City issued the "R3A Area Study." This study included the center of the city, but also extended to and encompassed Kempf's property. Although the publication expressed a concern that there were "insufficient controls over multiple housing in residential districts," Kempf's lots were designated as zoned R3B on maps showing both present and proposed zoning, and were not designated on another map purporting to show "special problem areas."

December 1976, as a second development phase of the property, Kempf contracted with Earl Yoder Construction Co. (Yoder) to build a twenty-nine unit apartment building on part of one of the larger lots. Yoder applied for and obtained a building permit on December 13, 1976, and the work commenced.

Several property owners in the neighborhood, including an ex-mayor of the city, commenced vigorous protests. Because the city attorney owned property "in close proximity" to the Kempf lots, he designated assistant city attorney Angela Ryan to cope with the legal aspects of the controversy.[1] Several of the city staff persons, including Ryan, took the position Kempf had failed to comply with the Large-Scale Residential Development ordinance (LSRD) because the total tract was more than two acres.[2] The two staff persons most directly involved in granting city building permits, Bowers and Siders, disagreed.

January 19, 1977, Ryan drafted and forwarded a letter to Kempf asserting the applicability of LSRD to the project and requesting that construction be stopped voluntarily until the city decided on its course of action.

---

1. The city attorney later entered a written appearance for the city in this litigation in district court, but there is no indication he took an active part.

2. If applicable in a situation like this where the property already was platted into lots, the ordinance would require the builder to go through a number of expensive steps in an attempt to secure city approval.

January 20, 1977, Kempf's then attorney by letter replied that construction would be halted on the condition such action would have no bearing on any future damage claim. At that point Yoder had $41,110.40 of his own money in foundation, footings, materials, and other expenses. In an obvious move to moot the legal controversy, Kempf, in an arm's-length transaction on February 4, 1977, sold the portion of the lot upon which the building was being constructed to Yoder, with the agreement the latter would take the risk it might not be completed.

February 9, 1977, the city officially revoked Kempf's building permit. Two days later, Yoder notified the city of its intention to resume construction.

February 14, 1977, this action was commenced, seeking declaratory and injunctive relief as well as damages. February 15, 1977, Yoder applied for a building permit; its request was denied the next day.

March 3, 1977, the district court, Judge August F. Honsell, Jr., presiding, found there was an actual investment of more than $79,000 in labor and materials installed and on hand for the building, and additional contract commitments in excess of $126,000. The court ordered that a writ of temporary injunction be issued, restraining the city from preventing further construction on the twenty-nine unit apartment building.

March 17, 1977, the matter of a permanent injunction came on for hearing, Judge Honsell again presiding.

The court found that the property had been improved in the first year after purchase as above indicated, and that on April 18, 1974, the city had issued a certificate of occupancy on the social services building constructed on a portion of the tract. Trial court further found that in the latter part of 1976 Kempf contacted Bowers of the city's building department and showed him a survey of the entire tract "indicating that it was the partnership's desire to erect a 29–unit apartment building on a subdivided portion thereof which would be less than two acres in size." Later in the day Bowers "orally communicated to … Kempf that the [apartment] building could be erected on a subdivided portion of the land."

The court found the contract was entered into with Yoder, which company incurred the interim expenses above mentioned. This subsequent sale to Yoder "was an arm's-length transaction made upon the advice of independent counsel representing the parties involved." The court found these transactions were made in good faith and for the purposes asserted. The city was enjoined from preventing further construction and directed to issue a building permit to Yoder. The court reserved the other issues in the case, including damages, for further hearing.

In a pretrial statement later filed in the case, the city stated it would not contest findings made by the court as a result of the March 17 hearing. The city did not attempt to appeal from that decision, nor does it now. From the combined testimony of city employees Ryan, Bowers, and Siders, we find the city was never misled nor misinformed about the size of the tract nor Kempf's plans for it when the city issued the permits for the social services building and the twenty-nine unit apartment.

After being delayed by the city, Yoder completed construction of the apartment building in July 1977. This was too late for rental to University of Iowa summer students. Before further development of the property could be commenced, the city imposed a moratorium on all construction other than single-family and duplex development. Although the moratorium covered a wider area than Kempf's tract, the moving cause appears to be the protest of several people in the area, whom Ryan characterized as "vehement." This pressure became so great that the city, without waiting for a new comprehensive plan adopted on May 30, 1978, commenced proceedings to change the zoning of the Kempf property and several other tracts. Despite Kempf's formal protests, the city, by final action on June 28, 1978, stripped the R3B zoning designation from the Kempf tract, rezoning it into

four different designations. The social services building lots were zoned CO (commercial office use); a portion of another lot was zoned R3A to allow for the twenty-nine unit apartment building; the balance of that lot was zoned R3, allowing multi-family development but requiring 3000 square feet per unit; and the remaining lots were zoned R2, allowing only single-family and duplex development. This action was taken despite Ryan's legal advice that the council members had "to have a zoning classification that will allow people a reasonable use," which she submitted with copies of several of our relevant decisions.

Kempf later filed an amendment to the original petition filed in 1977. Kempf asserted the city's action in rezoning the tract constituted an arbitrary, capricious, and discriminatory act having no relationship to public health, safety, or welfare, and the rezoning constituted an unconstitutional "taking" entitling him to damages.

The controversy finally came on for trial commencing May 6, 1985, Judge Harold J. Swailes presiding.

Kempf's expert valuation witness testified the area remaining in the tract after construction of the office building and the twenty-nine unit apartment was about 2.12 acres; that with R3B zoning (permitting a family unit for every 750 square feet) this would generate about 123 apartment units. After the downzoning, this witness testified the maximum use would be a nine unit apartment building located on part of one lot and a duplex on another lot. He placed the "before downzoning" value of the 2.12 acres at $200,000, the "after" value at $52,000.

The above testimony, however, indicated the witness did not take into consideration the economic feasibility of such limited construction, given the investment in the lot made by Kempf in reliance on "The North Side Study" and the R3B zoning when the development was started. Earl Yoder, Wayne Kempf, and Kenneth L. Albrecht all had extensive experience as building contractors in Iowa City. All testified building a nine unit apartment and a duplex would not be economically feasible; the cash flow income would not retire the debt; nor would lending agencies be willing to loan for such purposes in these circumstances. We find this testimony to be thoroughly credible. We further find, as did trial court, the evidence demonstrates there would be no market for single-family or duplex residences on the remaining Kempf tract lying behind the social services office building and beside the twenty-nine unit apartment building already constructed in the course of the development.

Trial court found the city's action in interrupting construction on the twenty-nine unit apartment building was unreasonable, arbitrary, and capricious and "constituted a tort for which liability is imposed under Chapter 613A of the Code of Iowa." The court found the damages to be in the amount of $7,483.13, and rendered judgment in that amount against the city. The record reflects the judgment has been paid. The city makes no complaint about this facet of the case in this appeal.

Trial court further found the city's spot downzoning of the Kempf tract was arbitrary, capricious, unreasonable, and unrelated to interests of public health, safety, welfare, or morals. The court further found it was not required to determine whether the zoning change was an unconstitutional "taking" because it was restoring the tract to its former R3B zoning classification. The "taking" issue, however, was reserved for future resolution in the event the city refused to issue building permits in accordance with the provisions of the prior zoning ordinance, which classified this property as R3B.

In this appeal the city asserts trial court's ruling was erroneous because Kempf did not overcome the strong presumption of validity of the ordinance that rezoned the tract. The city's fallback position is its contention that even if the court did not err in this regard, the court improperly imposed a zoning status that no longer exists.

■ I. The applicable legal principles in cases like this are well established, the difficulty arises in their applications. Zoning ordinances, like other legislative aids, carry with them a strong presumption of validity. As a result, an individual asserting the invalidity of a zoning ordinance has the burden to demonstrate its unreasonable, arbitrary, capricious, or discriminating nature. *City of Lamoni v. Livingston*, 392 N.W.2d 506, 511 (Iowa 1986); *Anderson v. City of Cedar Rapids*, 168 N.W.2d 739, 742 (Iowa 1969). Existing zoning restrictions are "subject to reasonable revisions with changing community conditions and needs as they appear." *Anderson*, 168 N.W.2d at 743; *see Keller v. City of Council Bluffs*, 246 Iowa 202, 207–08, 66 N.W.2d 113, 116 (1954).

■ On the other hand, the right of a municipality exercising the state's delegated police power in zoning resolutions does not extend to the violation of fundamental rights set out in either the United States or Iowa constitutions. *See Kasparek v. Johnson County Board of Health*, 288 N.W.2d 511, 517–18 (Iowa 1980); *Business Ventures, Inc. v. Iowa City*, 234 N.W.2d 376, 381–82 (Iowa 1975); 8 McQuillin, *Municipal Corporations* § 25.42, at 101 (3d ed. 1982). Kempf has pleaded the city's actions violated his rights under the Iowa Constitution, article I, section 1 ("All men ... have certain inalienable rights—among which are those of ... acquiring, possessing and protecting property...."), section 18 ("Private property shall not be taken for public use without just compensation first being made...."), and the United States Constitution, fifth amendment ("nor shall private property be taken for public use, without just compensation").

In this connection we have cautioned against the inevitable danger referred to by Mr. Justice Holmes in *Pennsylvania Coal Co. v. Mahon*, 260 U.S. 393, 415–16, 43 S.Ct. 158, 160, 67 L.Ed. 322, 326 (1922):

The protection of private property in the Fifth Amendment presupposes that it is wanted for public use, but provides that it shall not be taken for such use without compensation. A similar assumption is made in the decisions upon the Fourteenth Amendment. When this seemingly absolute protection is found to be qualified by the police power, the natural tendency of human nature is to extend the qualification more and more until at last private property disappears. But that cannot be accomplished in this way under the Constitution of the United States.

... We are in danger of forgetting that a strong public desire to improve the public condition is not enough to warrant achieving the desire by a shorter cut than the constitutional way of paying for the change.

*Business Ventures, Inc.*, 234 N.W.2d at 383 (citations omitted).

■ Zoning, however meritorious from the public's point of view, can never be used as a substitute for eminent domain. *F.H. Uelner Precision Tools & Dies, Inc. v. City of Dubuque*, 190 N.W.2d 465, 469 (Iowa 1971). Here, simplistic rules are neither available nor would they be helpful. "The point at which police power regulation becomes so oppressive that it results in a taking is impossible of general definition and must be determined on the circumstances of each case." *Woodbury County Soil Conservation District v. Ortner*, 279 N.W.2d 276, 278 (Iowa 1979). In the final analysis, "the power to zone is not unlimited. It must be reasonably exercised, in furtherance of the public safety, health, morals and welfare." *Uelner*, 190 N.W.2d at 468; *see Keller*, 246 Iowa at 209, 66 N.W.2d at 117 ("Property cannot be confiscated under the guise of police power. Thus an ordinance may be valid in its general aspect and at the same time be clearly arbitrary and unreasonable as applied to a particular state of facts.").

■ Often these cases require a balancing process, weighing the public good achieved by the zoning regulation against the hardship on the complaining property owner. *See Uelner*, 190 N.W.2d at 468 ("[U]ltimately the question is whether the hardship upon plaintiffs is overborne by

the public good resulting from inclusion of their properties in the rezoned area."); *Kasparek,* 288 N.W.2d at 517–18.

A facet of this balancing analysis may be the determination whether the property owner has "vested rights" that stand against a zoning change.

The vested rights concept is a part of the balancing of the respective legitimate interests of the private property owner against those of the general public, keeping in mind that legitimate and valuable expenditures in connection with the use of an affected tract or business conducted on it, before imposition of the regulation, may create a property right which cannot be arbitrarily interfered with or taken away without just compensation.

*Kasparek,* 288 N.W.2d at 518; *see Incorporated Town of Carter Lake v. Anderson Excavating & Wrecking Co.,* 241 N.W.2d 896, 902 (Iowa 1976); *Board of Supervisors v. Paaske,* 250 Iowa 1293, 1296–1300, 98 N.W.2d 827, 829–31 (1959).

Were we to apply the usual balancing test or even the more specific vested rights analysis in the circumstances of this case, the scales would tilt toward Kempf. The record discloses admissible testimony the downzoning of the tract in question would not contribute to public health, safety, or welfare. The open invitation the city extended in "The North Side Study" to proceed with such developments carries with it the plain conclusion there would be no adverse impact on city streets or utilities, nor does the city argue otherwise. The large investment Kempf made in filling, grading, and bringing in utilities for the whole tract in reliance on the zoning and the city's study would provide substantial support for application of the vested rights principle.

■ Under this record, however, we are not required to develop that analysis because a more limited test controls our determination. The overwhelming evidence discloses the lots in the remaining 2.12 acres of the Kempf tract cannot be improved with any development that would be economically feasible. For this reason we find that application of the downzoning ordinance to the lots in the 2.12 acres would be unreasonable.

■ The relevant principle is found in McQuillin:

Where it appears that under existing zoning restrictions property must remain for an unpredictable future period unimproved, unproductive and a source of expense to the owners from heavy taxes, the zoning ordinance is unreasonable as to such property.

8 McQuillin, *Municipal Corporations* § 25.45, at 122; *see Business Ventures, Inc.,* 234 N.W.2d at 382; *Petersen v. City of Decorah,* 259 N.W.2d 553, 554 (Iowa Ct.App.1977). Undergirding this rule is the concept that in these situations there is, in effect, an unconstitutional taking. Although a property owner does not necessarily have a remedy if the police regulation merely deprives the owner of the most beneficial use of his or her property, *see Stone v. City of Wilton,* 331 N.W.2d 398, 404 (Iowa 1983); *Ortner,* 279 N.W.2d at 279, frustration of investment-backed expectations may amount to a taking, *see Agins v. City of Tiburon,* 447 U.S. 255, 260, 100 S.Ct. 2138, 2141, 65 L.Ed.2d 106, 112 (1980) ("The application of a general zoning law to particular property effects a taking if the ordinance ... denies an owner economically viable use of his land.") (citations omitted); *Block v. Hirsh,* 256 U.S. 135, 156, 41 S.Ct. 458, 460, 65 L.Ed. 865, 871 (1921) ("[T]here comes a point at which the police power ceases and leaves only that of eminent domain...."); *Osborn v. City of Cedar Rapids,* 324 N.W.2d 471, 474 (Iowa 1982) ("Plaintiffs' claim comes down to an assertion that they are in effect left with a hollow title to some of their land, that the public has in effect taken its use away from them."); *Kasparek,* 288 N.W.2d at 519 ("[I]n the instant case, plaintiffs and intervenors merely seek to *complete* their ongoing subdivision projects for which their property was appropriately zoned at all relevant times.") (emphasis in original); *Ortner,* 279 N.W.2d at 278 ("Even the exercise of police power, however, may

amount to a taking if it deprives a property owner of the substantial use and enjoyment of his property."); *Phelps v. Board of Supervisors*, 211 N.W.2d 274, 276 (Iowa 1973) ("However, a 'taking' does not necessarily mean the appropriation of the fee. It may be anything which substantially deprives one of the use and enjoyment of his property or a portion thereof."); *Paaske*, 250 Iowa at 1299–1300, 98 N.W.2d at 831; *Keller*, 246 Iowa at 210, 66 N.W.2d at 118 ("[I]f the only reasonable use of the property is seriously affected by the zoning ordinance, the owner should be entitled to relief...."); *Equitable Building Co. v. City of Royal Oak*, 67 Mich.App. 223, 227–28, 240 N.W.2d 489, 492 (1976); *Burrows v. City of Keene*, 121 N.H. 590, 598, 432 A.2d 15, 19 (1981).

We agree with the trial court that application of the June 28, 1978, zoning ordinance to Kempf's underdeveloped lots and portions of lots would be unreasonable and therefore invalid. We are left with the question of the present and future status of these lots and portions of lots.

II. Trial court, having arrived at the same conclusion we have reached in the last division, ordered that "these premises be returned to the R3B zoning in effect at the time of enactment of said amended zoning ordinance." Inadvertently picking up a different ordinance number from an exhibit, the court declared: "Defendant's Ordinance No. 78–2900 [is] ... illegal, null, and void as to [Kempf's] premises." Apparently the ordinances involved here were numbered 78–2901 through 78–2906. Trial court was not provided an opportunity to make a correction.

The city vigorously argues the whole prior zoning ordinance was repealed; the court could not restore the property to a zoning classification that no longer exists, and in any event should not exercise a legislative power by mandating zoning classifications. Kempf's main assertion is that continued development of the property as allowed by the pre–1978 zoning should be permitted.

In view of these contentions, we hold that ordinances numbered 78–2901 through 78–2906 may apply to the Kempf property, provided, however, that Kempf shall be permitted to proceed with the development of apartment buildings, as shown by the record in this case, to the extent that such buildings conform to the ordinances in effect prior to the 1978 rezoning, with the exception of the controversial LSRD ordinance, which we hold inapplicable in this situation. The city shall be enjoined from prohibiting this use of the property by Kempf. Further development or redevelopment of the property beyond that contemplated by Kempf as shown by this record and noted in this opinion, whether carried out by Kempf or future owners, will be subject to the amended ordinances above designated.

Support for this disposition, which neither leaves the property unzoned nor caused this court to assume legislative functions, is found in *Schwartz v. City of Flint*, 426 Mich. 295, 325–31, 395 N.W.2d 678, 690–93 (1986).

To the extent the 1978 zoning ordinance was declared void by the district court, the district court's ruling is reversed.

We affirm in part, reverse in part, and remand to the district court for a disposition in conformance with this opinion. Costs are taxed eighty percent to the defendant city, and twenty percent to the plaintiffs.

AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.

All Justices concur except WOLLE, J., who dissents.

WOLLE, Justice (dissenting).

I would reverse because I conclude from my de novo review of this record that the rezoning ordinance as applied to the plaintiffs' property passed constitutional muster. I disagree with the trial court's conclusion that the zoning of the plaintiffs' property was illegal spot zoning and so unreasonable and arbitrary as to serve no public interest. I disagree with the majori-

ty's conclusion that the city's rezoning of the property amounted to an unconstitutional taking.

I. The trial court found the city had "no rational basis for the rezoning" and labeled it as "spot zoning" which was "illegal and void". I disagree with both that finding and those legal conclusions of the trial court. The rezoning ordinance here challenged was not precipitously dropped upon this property. Years of land use study and planning preceded adoption of this ordinance; it was designed to implement the city's comprehensive land use plan. The objects of the plan and the ordinance were public purposes: to minimize incompatible land uses and to preserve existing neighborhoods. The rezoning ordinance promoted those objects and constituted a valid legislative exercise of police power by the city. *See Kent v. Polk County Board of Supervisors,* 391 N.W.2d 220, 225 (Iowa 1986). A zoning ordinance should be allowed to stand notwithstanding a substantive due process challenge when it is facially valid and its reasonableness is fairly debatable. *Business Ventures, Inc. v. Iowa City,* 234 N.W.2d 376, 381 (Iowa 1975); *Cole v. City of Osceola,* 179 N.W.2d 524, 528 (Iowa 1970); *see* A. Vestal, *Iowa Land Use And Zoning Law* § 2.16, at 57–58 (1979). I conclude from this record that the city made a number of tough legislative choices in adopting the various land use provisions contained within this rezoning ordinance, and the resulting ordinance had a rational nexus to legitimate public purposes. The plaintiffs did not sustain their heavy burden to overcome the strong presumption that the city's rezoning ordinance satisfied substantive due process both facially and as applied to their specific property.

II. I disagree with the majority opinion's conclusion that the city unconstitutionally used this ordinance as a substitute for eminent domain. I agree that on this constitutional issue we must carefully balance the public good which legislative action was designed to achieve against any oppressive effects upon individual citizens. The application of a zoning ordinance to a particular property may not be so arbitrary and unreasonable as to amount to an unconstitutional taking without the just compensation mandated by eminent domain. *Kasparek v. Johnson County Board of Health,* 288 N.W.2d 511, 517–18 (Iowa 1980); *F.H. Uelner Precision Tools & Dies, Inc. v. City of Dubuque,* 190 N.W.2d 465, 469 (Iowa 1971). Unlike the majority, however, I conclude this rezoning ordinance did not squeeze all economic value from the property.

The plaintiffs' own evidence, viewed realistically, clearly disclosed that their property after rezoning had substantial value. The evidence showing diminution in the market value of the property was not sufficient to overcome the presumption that the city's exercise of police power by enactment of this zoning ordinance was within constitutional limits. *See Penn Central Transportation Co. v. New York City,* 438 U.S. 104, 124–25, 98 S.Ct. 2646, 2659, 57 L.Ed.2d 631, 648–49 (1978); *Stone v. City of Wilton,* 331 N.W.2d 398, 402 (Iowa 1983) (Land use restrictions may be upheld "even though the challenged regulations destroyed or adversely affected recognized real property interests or flatly prohibited the most beneficial use of the property.").

I would uphold the city's rezoning of the plaintiffs' property and therefore would reverse the trial court's decision.