# In the Iowa Supreme Court

---

No. 24–1813

Submitted December 17, 2025—Filed April 24, 2026

---

**Worthwhile Wind LLC,**

Appellee,

vs.

**Worth County Board of Supervisors,**

Appellant.

---

Appeal from the Iowa District Court for Worth County, Colleen Weiland, judge.

A county passed a moratorium and later an ordinance regulating wind energy development within its borders, and the county now appeals the district court's decision to allow a wind energy developer to continue its project under preexisting law. **Reversed and Case Remanded.**

McDonald, J., delivered the opinion of the court, in which all justices joined except McDermott, J., who filed a dissenting opinion.

Eric M. Updegraff (argued) of Hopkins & Huebner, P.C., Des Moines, for appellant.

Bret A. Dublinske (argued), Brant M. Leonard, Nicci Ledbetter, Kelcy Whitaker, and Kristy Dahl Rogers (until withdrawal), of Fredrikson & Bryon, P.A., Des Moines, for appellee.

**McDonald, Justice.**

A wind energy developer devoted several years and expended millions of dollars planning a commercial wind turbine project in Worth County, but the developer never applied for or obtained a permit to construct the project. When the county adopted a resolution imposing a moratorium on further wind projects and then an ordinance regulating commercial wind turbines, the developer filed this suit. The developer claimed the moratorium and the new ordinance effectively precluded it from developing the project. The developer contended that it acquired vested rights in the prior zoning regime and that the county enacted the ordinance in bad faith. The district court agreed with both contentions and held that the developer could complete development of its wind energy system in accord with the law as it existed before the resolution and new ordinance were passed. For the reasons explained below, we reverse.

I.

Worthwhile Wind LLC is an affiliate of Invenergy, LLC, a Chicago-based renewable energy development company. Beginning in 2018, Worthwhile undertook efforts to develop a commercial wind energy conversion system (C-WECS) in Worth County. As conceived, the project involved the construction and operation of as many as fifty-five commercial wind turbines across approximately 100 parcels with the capacity to generate 165 megawatts of electricity. Worthwhile was not actually going to construct and operate the energy system. Instead, this was a "development-transfer" project. As a development-transfer project, Worthwhile would complete the preliminary work, including conducting studies and obtaining necessary regulatory approvals and permits, among other things, so that it could sell the project to a third party who would then construct and operate the turbines. Between 2018 and early 2021, Worthwhile undertook

these preliminary development activities. It commissioned environmental screenings, engineering assessments, avian use studies, bat acoustic surveys, sound and shadow flicker analyses, and other studies. It executed wind energy leases with over 100 landowners. It filed an application with the Midcontinent Independent System Operator (MISO), which manages the electrical grid and the generator interconnection process, and posted approximately $3.8 million in interconnection security deposits.

Although Worthwhile completed many preliminary activities in the development of the project, the essential parameters of the project remained unspecified and unstarted. Worthwhile had not selected a wind turbine model to use in the development. It thus could not identify the number of turbines that needed to be built within the county to achieve the projected 165-megawatt output because that number depended upon the turbine selected. The only physical construction Worthwhile performed was the erection of two meteorological (MET) towers and the excavation of two locations for cement-stabilized "seal slabs" intended to serve as preliminary bases for future turbine foundations. Worthwhile's own witness described this work as preliminary to actually laying a foundation and testified it was done to secure a favorable federal production tax credit. No additional construction activity took place on the approximately 160 parcels that were part of the project area. In total, Worthwhile claims to have invested $2,800,814.55 in these preliminary activities prior to the enactment of the challenged ordinance, exclusive of the MISO interconnection deposits. At no point prior to the enactment of the moratorium and the new ordinance at issue in this case did Worthwhile apply for or obtain any permit or other authorization to develop, construct, or operate the commercial wind turbines that constitute the core of the project.

Worthwhile perceived Worth County as favorable toward the development of wind energy projects. At the time Worthwhile began its preparatory work on the project, Worth County was partially zoned. Three townships within the county were governed by a zoning ordinance originally adopted in 2009. The remainder of the county was unzoned. No countywide ordinance regulating the construction of wind turbines existed, and no county permits were required for development in the unzoned portions of the proposed project area. In 2017, the Worth County Board of Supervisors passed a resolution supporting a different wind energy project, one that was centered in Freeborn County, Minnesota that would extend into Worth County:

> WHEREAS wind energy is a renewable energy source and an important component of our nation's energy independence portfolio;

> WHEREAS wind energy now supplies over 35% of Iowa's total energy produced;

> . . . .

> WHEREAS Worth County, Iowa, currently has 229 turbines, which contribute close to $172,000,000.00 in assessed valuation to our count[y's] tax base;

> WHEREAS that assessed valuation is nearly 16% of Worth County's total property valuation;

> AND WHEREAS the development and existence of wind farms in Worth County not only contributes to the property tax base but also provides jobs to our citizens and ancillary support business opportunities, including a major off load intermodal transportation facility at Manly, Iowa, and multiple wind industry maintenance businesses in Winnebago and Worth Counties that work with wind farms across the Midwest;

> . . . .

> WHEREAS[] the development of wind projects in Worth County provides continued economic opportunity for residents and property owners of Worth County;

WHEREAS Worth County's experience with other wind projects has been positive and fruitful;

. . . .

THEREFORE, BE IT RESOLVED: The Worth County Supervisors support the further development of the Freeborn Wind Farm and confirm there are no county ordinances, permits or other approvals required for construction and operation of the project, and Worth County looks forward to seeing the Freeborn Wind Farm constructed and operating in the very near future.

In 2021, public sentiment in the county regarding wind development turned based on the public's complaints about the turbines following the completion of the Freeborn Wind Farm project. The public elected two new supervisors to the Board of Supervisors reflecting the change in sentiment. On April 12, 2021, the Board of Supervisors adopted a temporary moratorium on construction of commercial wind energy systems pending the development of updated regulations. The moratorium resolution stated:

WHEREAS, the Board of Supervisors recently has learned that a wind energy company has obtained easement rights from several land owners in a region of Worth County predominately within drainage districts; and WHEREAS, the aforementioned drainage districts, are governed by Trustees and contain millions of dollars of drainage infrastructure that could be jeopardized by the CWES project; and WHEREAS, research indicates that CWES turbines can interfere with microwave communications signals which could affect our county communication system; and WHEREAS, the County has an interest in preventing and abating any resulting nuisance from decommissioned commercial wind turbines through more robust decommissioning requirements; and WHEREAS, the County has an interest in protecting the County's infrastructure, natural resources and property rights through adequate setback provisions; WHEREAS, the Board of Supervisors will require substantial time to gather information and coordinate with multiple agencies for the purpose of reviewing, updating or creating ordinances, policies and procedures relative to CWES development;

NOW THEREFORE, BE IT RESOLVED by the Board of Supervisors of Worth County, Iowa, that Worth County now imposes a moratorium, effective immediately on CWES for the purpose of

drafting and adopting any necessary and proper revisions to the CWES ordinance. This moratorium shall sunset and be null and void on July 1st 2022.

(Emphasis omitted.) Worthwhile was the only wind energy company actively developing in the county at the time this resolution was adopted.

Ten days before the moratorium vote, Worthwhile's counsel sent a letter to the Worth County Attorney asserting that Worthwhile had vested rights and proposing a development agreement. From approximately April 2021 through May 2022, the parties negotiated the terms of such an agreement, exchanging draft agreements addressing setbacks, sound limits, shadow flicker thresholds, turbine height, and turbine models. The negotiations proved unavailing. On May 9, 2022, the Board of Supervisors declined to approve any version of the development agreement.

On June 27, the Board enacted Worth County, Iowa, Ordinance 2022.06.27 (June 27, 2022), regulating the construction and operation of the C-WECS in Worth County. The new ordinance imposed setback distance requirements, a maximum turbine height of 500 feet, noise restrictions, and a restriction permitting zero shadow flicker at a human-occupiable building or the property line of an adjacent building site. *Id.* The ordinance provided that the setback requirements could be waived upon agreement of affected landowners and approval by the Board of Adjustment. *Id.*

Worthwhile did not attempt to modify the project to comply with the new ordinance, nor did it seek waivers or any other accommodation. Instead, Worthwhile filed this declaratory judgment action. In count I, Worthwhile sought a declaration that it had vested rights to complete the project under pre-moratorium law. In count I, it also claimed that the county enacted the new ordinance in bad faith and therefore the new ordinance could not be enforced

against Worthwhile. In count II, Worthwhile alleged the new ordinance was arbitrary, capricious, unreasonable, and contrary to public policy. Following a bench trial, the district court ruled in favor of Worthwhile on count I. The district concluded that Worthwhile had vested rights in the project and that the county acted in bad faith. The court ordered that Worthwhile "has a vested right to complete development of its commercial wind energy system project in accordance with Worth County law that existed before Resolution No. 2020.04.05 (moratorium) and Worth County Ordinance 2022.06.27 (new ordinance)." The county appealed.

## II.

We review the district court's findings of fact for substantial evidence and its conclusions of law de novo. *See* Iowa R. App. P. 6.907; *Graziano v. Bd. of Adjustment*, 323 N.W.2d 233, 236–37 (Iowa 1982).

## III.

"[N]o property owner has a vested right in the continuation of a particular zoning classification." *Quality Refrigerated Servs., Inc. v. City of Spencer*, 586 N.W.2d 202, 206 (Iowa 1998). When a property owner challenges the denial or revocation of some permit or other approval of a development, the general rule is that the reviewing body or court will apply "the zoning law as it exists at the time of the . . . decision." *U.S. Cellular Corp. v. Bd. of Adjustment*, 589 N.W.2d 712, 717 (Iowa 1999) (quoting Arden H. Rathkopf, Daren A. Rathkopf & Edward H. Ziegler, *Rathkopf's the Law of Zoning and Planning* § 26.02(2)(a), at 26-3 to -4 (4th ed. 1996)). There are two recognized exceptions to the time of the decision rule: the vested rights exception and the bad faith exception. *Geisler v. City Council*, 769 N.W.2d 162, 167 (Iowa 2009); *U.S. Cellular*, 589 N.W.2d at 718. We address each in turn.

A.

1.

The vested rights doctrine in the zoning context mediates a longstanding tension between the legislative power of local governments to regulate land use and the property rights of individuals who, in reliance upon administrative governmental action, have committed substantial resources to a particular course of development. *See* 4 Arden H. Rathkopf, Daren A. Rathkopf & Edward H. Ziegler, Jr., *Rathkopf's the Law of Zoning and Planning* § 70:1, at 70-2 to -3 (4th ed. 2003) [hereinafter Rathkopf et al., *Rathkopf's the Law of Zoning*]. The doctrine operates as an exception to the general rule that zoning changes apply to all properties within the affected jurisdiction, including those whose owners may have contemplated a different use under the prior regime.

Jurisdictions across the country have adopted varying formulations of the vested rights doctrine. "In a majority of states, courts have established the doctrine that a landowner's right to develop land vests only at that point in time when there has been substantial construction or action in reliance upon a lawfully issued permit." *Id.* § 70:8, at 70-7. Under the majority rule, a developer must make "substantial expenditures in reliance upon a permit to establish a use which, when completed, is contrary to the restrictions of a zoning amendment enacted after the right has vested." 3 *id.* § 37:3 n.2, at 37-5; *see also* Steve P. Calandrillo, Chryssa Deliganis & Christina Elles, *The Vested Rights Doctrine: How a Shield Against Injustice Became a Sword for Opportunistic Developers*, 78 Ohio St. L.J. 443, 448 (2017) [hereinafter Calandrillo, Deliganis & Elles] (stating the majority rule applies only where the developer has expended substantial sums "on a validly issued building permit" (quoting Gregory Overstreet & Diana M. Kirchheim, *The Quest for the Best Test to Vest:*

*Washington's Vested Rights Doctrine Beats the Rest*, 23 Seattle U. L. Rev. 1043, 1045 (2000)). "[T]he existence of a validly issued building permit was the principal benchmark of a vested rights claim." Grayson P. Hanes & J. Randall Minchew, *On Vested Rights to Land Use and Development*, 46 Wash. & Lee L. Rev. 373, 389 (1989) [hereinafter Hanes & Minchew]. Under the majority approach, expenditures made prior to obtaining a permit cannot form the basis for a vested rights claim because they are, by definition, not made in reliance upon any permit. The rationale for the majority rule follows from its doctrinal foundation: until the property owner has asked for and received a permit, the property owner's plans remain speculative, and no property right has crystallized that could be infringed by a subsequent change in zoning law.

In contrast, the minority rule "generally holds that the right to a permit vests at the time of application as long as the application is consistent with the building codes and ordinances then in effect." 4 Rathkopf et al., *Rathkopf's the Law of Zoning* § 70:16, at 70-18 to -19; *see also* 101A C.J.S. *Zoning and Land Planning* § 290, Westlaw (database updated Apr. 2026) ("In some jurisdictions, a zoning permit applicant's rights are determined by the ordinance in existence at the time of filing an application for the permit."); Calandrillo, Deliganis & Elles, 78 Ohio St. L.J. at 451 ("Generally, the minority rule allows a developer's rights to vest once a complete project application is filed."). The minority approach developed as "land development became an intensely regulated process requiring compliance with a host of complex land use regulations and the issuance of multiple governmental approvals prior to ground-breaking," which "forced landowners to expend substantial resources and crystallized their development expectations far in advance of the issuance of a building permit." Hanes & Minchew, 46 Wash. & Lee L. Rev. at 389.

Some states adopt an intermediate approach. Under this intermediate approach, to obtain vested rights in the completion of the project, the developer must have engaged the administrative arm of the local government and obtained some sort of approval to proceed under the prior zoning regime, whether through obtaining a conditional or special use permit, securing approval of a subdivision or site plan, or some other form of authorization. *See id.* at 390 (noting that courts recognizing the intermediate approach have concluded that the determinant governmental approval may be "approval of site-specific rezoning application, approval of a conditional or special use permit, approval of a subdivision or site plan, approval of a preliminary permit, or an informal approval given by a public official").

Whatever the particular formation of the doctrine, courts uniformly recognize that purely private expenditures, made without any form of engagement with the administrative arm of the local government, either by submission of an application for approval or by receiving some sort of approval to proceed, are not sufficient to support a claim for vested rights. As commentators have observed, there must be some affirmative administrative governmental act upon which the landowner can rely to proceed with development. *Id.* at 388–90.

2.

In Iowa, zoning by a municipality is "a traditional legislative function." *Geisler*, 769 N.W.2d at 166. Courts generally will not interfere with the legislative function due to "the traditional separation of powers between the three branches of government." *Id.* Based on that deference to the legislative function, Iowa's courts have adopted the rule that a reviewing body or court must determine the legality of a zoning decision based on the zoning law the legislative body put in

place at the time of the decision. *See id.* at 167. "Employed by a majority of jurisdictions, the rule rests on the theory that courts should not authorize construction contrary to legislative provisions in effect at the time of decision." *Ackman v. Bd. of Adjustment,* 596 N.W.2d 96, 101 (Iowa 1999).

Like the majority of other courts, however, our cases recognize a vested rights exception to this general rule based upon the developer or owner's reliance on formally approved plats or a validly issued permit. *See Kasparek v. Johnson Cnty. Bd. of Health,* 288 N.W.2d 511, 518 (Iowa 1980) (en banc) (holding that a developer had vested rights in the completion of a development after the board of supervisors formally approved development plat maps); *Keller v. City of Council Bluffs,* 66 N.W.2d 113, 119 (Iowa 1954) ("The theory of vested rights relates only to such rights as an owner of property may possess not to have his property rezoned after he has a building permit and has started his construction or improvement."). In *Board of Supervisors v. Paaske,* we concluded that the property owner did have a vested right to complete a project where he obtained permits for the project and expended substantial sums to complete the project in reliance on those permits. 98 N.W.2d 827, 830–31 (Iowa 1959). In *Crow v. Board of Adjustment,* this court explained that "[a] building permit duly and legally issued by a municipality is more than a mere license revokable at the will of the licensor." 288 N.W. 145, 146 (Iowa 1939). "[W]hen the permittee has to some extent acted thereon and thereby incurred expense such permit is not revokable on the grounds that the proposed building and business would be objectionable to residents of the neighborhood." *Id.* In that case, we held the owner could proceed with the development because "the building permit was valid in its inception" and the "construction work was in progress." *Id.* at 147.

In contrast, in numerous cases, this court has rejected vested rights claims where the owner or developer had not obtained a validly issued permit. In *Geisler v. City Council*, we rejected the owner's vested rights claim "[b]ecause only expenditures made pursuant to a validly-issued permit will support the vested rights exception." 769 N.W.2d at 168. In *City of New Hampton v. Blayne–Martin Corp.*, we rejected the owner's vested rights claim based on a permit because "[t]he permit, when issued, was unlawful and furnished no basis for reliance by the" owners. 594 N.W.2d 40, 45 (Iowa 1999); *see also City of Lamoni v. Livingston*, 392 N.W.2d 506, 510 (Iowa 1986) ("[W]hen a permit is granted wholly without legal authority, the holder does not gain vested rights in it."). In *United States Cellular Corp. v. Board of Adjustment*, we explained that Iowa law holds "that an applicant has no vested right to a particular zoning ordinance." 589 N.W.2d at 718. We explained that the owner in that case could not make a vested rights claim because "it ha[d] not yet been issued a permit that could provide a basis for the acquisition of such rights." *Id.* In *Quality Refrigerated Services, Inc. v. City of Spencer*, a company renovated its building without obtaining a required building permit and then sought to claim vested rights. 586 N.W.2d at 204, 206–07. We found no vested rights because the property owner had not obtained a building permit at the time the property was rezoned. *Id.* at 208.

3.

Applying these principles here, we conclude that Worthwhile's vested rights claim fails as a matter of law. Worth County never formally approved a plat. Worthwhile never applied for or obtained a permit to construct or operate the commercial wind turbines that are the object of the project. The only permit Worthwhile obtained from Worth County was a permit for a single MET tower.

The MET tower is not the project. A permit to erect a MET tower does not vest a right to construct dozens of commercial wind turbines across one hundred parcels.

Worthwhile resists this conclusion. Worthwhile argues that requiring governmental approval as a predicate to vesting produces an absurd result in this case. In unzoned areas where no permit is required or available, Worthwhile argues, a developer could never acquire vested rights regardless of the magnitude of its investment. This argument does not withstand scrutiny. It is not an absurd result to conclude that the vested rights doctrine applies only in limited circumstances. The vested rights doctrine protects settled expectations; expectations that crystallize when the government, through its established permitting or approval process, has signaled that a proposed use conforms with the applicable regulatory framework. In an unzoned area, no such signal has been given. A developer who spends money in an unzoned area does so with knowledge that local government retains the full scope of its legislative power to enact zoning regulations. No enforceable right arises in a regulatory vacuum. In addition, the vested rights doctrine is not the only protection available to a developer in an unzoned area. The bad faith doctrine, the Contracts Clause, the Due Process Clause, and the Takings Clause of the State and Federal Constitutions might provide alternative avenues of relief against arbitrary or confiscatory governmental action. *See, e.g., Incorporated Town of Carter Lake v. Anderson Excavating & Wrecking Co.*, 241 N.W.2d 896, 902 (Iowa 1976) (holding that application of permitting requirement in violation of existing lease agreement, a vested property right, would violate due process and constitute a taking without just compensation). None of those claims are implicated here.

Related to this argument, Worthwhile also argues that so long as its expenditures were lawful, the vested rights exception applies. It is true that in *Quality Refrigerated Services*, the court, as part of its analysis, determined whether the expenditures in that case were "lawful." 586 N.W.2d at 206. The lawfulness of the developer's actions in that case was at issue, however, only because the developer proceeded to develop its property in violation of existing law by acting without a permit. *Id.* at 208. Because the property owner's actions were unlawful, i.e., taken without a permit, the property owner could not obtain vested rights. *Id.* The converse of that holding is not that any expenditure permitted by law will support a vested rights claim.

As discussed above, our precedents establish that only a lawfully authorized project—a project for which the developer had obtained a permit or other official government authorization to proceed—can support a vested rights claim. This is because the vested rights claim is based on reliance on administrative approval of the development rather than reliance on the law or, in this case, the absence of law. The magnitude of the expenditure, standing alone, even when not unlawful, has never been sufficient in our jurisprudence to vest development rights. Were we to accept Worthwhile's position, any property owner or developer could insulate itself from lawful regulation merely by directing expenditures toward a project in an unzoned area of a municipality. Such a rule would interfere with the legislative function and effectively strip local governments of their police power to regulate land use.

This concern is especially acute here. The project involves as many as fifty-five commercial turbines at an estimated total cost potentially exceeding $300 million. Worthwhile's pre-moratorium expenditure of approximately $2.8 million represents less than 1% of the total cost. The project remains largely

undefined. Worthwhile had not selected a turbine model, could not identify the number of turbines it would build, and had not purchased a single turbine. The right Worthwhile claims to have vested—the right to construct an unknown number of unspecified turbines at unidentified locations to be sold to an undisclosed buyer—lacks the definiteness that the vested rights doctrine presupposes and that the permitting and approval process imposes. We note these facts not because the magnitude of the expenditure alone would alter the analysis—the permit requirement is a threshold condition, not a sliding scale—but because they illustrate the consequences of the rule Worthwhile asks us to adopt and because they underscore the absence of the settled expectations the vested rights doctrine is designed to protect.

B.

The bad faith doctrine is the second recognized exception to the time of decision rule. One thing should be noted at the outset regarding the bad faith doctrine. As traditionally understood, the doctrine applies to challenge administrative-executive actions relating to the approval or disapproval of a particular project. Under this doctrine, the reviewing body does not apply a new ordinance when assessing a challenge to an administrative-executive decision if the reviewing body concludes that the administrative-executive body acted in bad faith. For example, in *Giesler*, we stated, "[A] reviewing court will not apply a new ordinance if officials acted in bad faith by denying or delaying approval of a properly submitted and conforming site plan in order to alter a zoning ordinance to bar the prospective development." *Geisler*, 769 N.W.2d at 167.

To find bad faith, Iowa courts require "illegality . . . coupled with an improper purpose." *Id.* at 168 (footnote omitted). "[A]n illegality is established if the board has not acted in accordance with a statute; if its decision was not

supported by substantial evidence; or if its actions were unreasonable, arbitrary, or capricious." *Id.* (quoting *Perkins v. Bd. of Supervisors,* 636 N.W.2d 58, 64 (Iowa 2001)). As to improper purpose, "it can be discerned that an improper purpose exists" "[w]hen a zoning authority adopts a new zoning regulation designed to frustrate a particular applicant's plans for development." *TSB Holdings, L.L.C. v. Bd. of Adjustment,* 913 N.W.2d 1, 15 (Iowa 2018).

Zoning ordinances carry "a strong presumption of validity." *Id.* at 14 (quoting *Neuzil v. City of Iowa City,* 451 N.W.2d 159, 163 (Iowa 1990)). A person challenging an ordinance must overcome this presumption by showing the ordinance is "unreasonable, arbitrary, capricious or discriminatory, with no reasonable relationship to the promotion of public health, safety, or welfare." *Id.* (quoting *Shriver v. City of Okoboji,* 567 N.W.2d 397, 401 (Iowa 1997)). "Zoning is dynamic and changing, with 'any existing restrictions being always subject to reasonable revisions [in light of] changing community conditions and needs as they appear.' " *Id.* at 15 (alteration in original) (quoting *Anderson v. City of Cedar Rapids,* 168 N.W.2d 739, 743 (Iowa 1969)). There is a meaningful difference between a county attempting to properly regulate a proposed future use and a county passing an ordinance with the improper purpose of frustrating a particular project. *See id.* at 15. In *United States Cellular,* this court identified a "common theme" among the factual patterns prompting courts to apply the bad faith exception: cases in which local officials were "trying to keep one jump ahead" of a developer and "attempting to change the rules," or where officials "in bad faith, delay[ed] . . . approval of a properly submitted and conforming building plan while they alter[ed] a zoning ordinance to bar the prospective development." 589 N.W.2d at 717 (first quoting *State ex rel. Humble Oil & Refin.*

*Co. v. Wahner*, 130 N.W.2d 304, 311 (Wis. 1964); and then quoting *Hatcher v. Plan. Bd.*, 490 N.Y.S.2d 559, 560 (App. Div. 1985)).

Worthwhile has not carried its burden of showing the Board of Supervisors acted illegally. The new ordinance imposed setback distances, height limitations, noise restrictions, and shadow flicker standards—precisely the kinds of regulatory measures that local governments routinely adopt in the exercise of their police power. *See TSB Holdings*, 913 N.W.2d at 14. Worthwhile presented no evidence that the substantive provisions of the new ordinance lacked a rational basis or bore no reasonable relationship to the public welfare. The county presented evidence that the supervisors who voted in favor of the ordinance did so after reviewing over one thousand pages of material and that they acted for purposes related to the general health, welfare, and property rights of the citizens of Worth County. Without a showing of illegality, the bad faith claim fails.

Nor does the record support a finding that the county acted for an improper purpose. Worthwhile advances two principal arguments. First, Worthwhile points to the moratorium resolution, which expressly referenced "a wind energy company" that had "obtained easement rights from several land owners." Second, Worthwhile contends the new ordinance is so restrictive as to effectively prohibit the project, reducing buildable acreage by approximately 98.2%.

As to the first argument, we acknowledge that the moratorium resolution's language is suggestive. The temporal proximity between the county's learning of the project and its adoption of the moratorium, combined with the resolution's express reference to "a wind energy company," invites an inference that the county acted specifically in response to Worthwhile. However, the fact that the

citizens in the county and the Board of Supervisors were aware of Worthwhile's activities is not sufficient to overcome the strong presumption of validity that attaches to legislative zoning decisions. *See id.* More important, Worthwhile blends the April 2021 moratorium and the June 2022 new ordinance. The moratorium is not the primary object of this legal challenge. Instead, it is the new ordinance. The relevant inquiry under the bad faith doctrine, as applied in this case, is whether the final legislative act was enacted with an improper purpose. There is no evidence of that. More than one year passed between the adoption of the moratorium and the adoption of the new ordinance. The negotiations between the county and Worthwhile in the interim demonstrate that the county was willing to engage with Worthwhile and to explore a path forward, which attenuates the inferential force of the moratorium's language as evidence of improper purpose in the adoption of the new ordinance.

As to the second argument, the restrictiveness of the new ordinance is a factor, but it is not dispositive. Worthwhile's calculation of the 98.2% reduction in buildable acreage assumed that only turbines at the maximum allowable height of 500 feet would be used, yet Worthwhile's own witnesses conceded that shorter turbine models exist and are commercially available. Worthwhile performed no analysis of the impact the new ordinance would have if it used shorter turbines or negotiated setback waivers from adjacent landowners. No calculations were made of the total number of turbines that could be sited on the remaining buildable acres under any scenario. One of Worthwhile's own witnesses testified only that it was "possible" that the number of available turbine sites was zero—hardly the showing necessary to overcome the strong presumption of validity.

This is not a case in which a zoning authority delayed action on a conforming permit application while it rushed to change the rules. Worthwhile never filed a permit application. It never submitted construction plans for governmental approval. It never presented the county with a completed, conforming proposal that the county could approve or deny. The county therefore had nothing to delay and no pending application to frustrate.

We acknowledge that no countywide permitting regime for commercial wind energy systems existed prior to the challenged ordinance, and Worthwhile could not have filed an application under a framework that did not yet exist. But this fact cuts against Worthwhile's bad faith claim rather than in favor of it. Where no permitting process has been established, the decision to create one is a paradigmatic exercise of the police power, not evidence of bad faith. This court's bad faith cases involve governmental interference with an established process—delaying a pending application, revoking a conforming permit, or changing rules midstream. Here, there was no process to subvert. The county's decision to adopt a moratorium and new ordinance upon learning of a proposed large-scale commercial wind energy development is consistent with a legitimate interest in ensuring that an adequate regulatory framework is in place before such a development proceeds.

We conclude the district court erred in finding bad faith. The presumption of validity that attaches to legislative zoning decisions requires more than evidence that the county was aware of and responded to a proposed development. It requires evidence of illegality coupled with an improper purpose that transcends a legitimate exercise of the police power. This record does not support such a finding.

IV.

The Board of Supervisors is vested with legislative power over local land use policy. *Ackman*, 596 N.W.2d at 104. No property owner has a right to be an island unto itself and insist that the Board of Supervisors be divested of the power to make and apply new law in a previously unzoned area of the county. The vested rights exception and bad faith exception are related to claims arising out of administrative-executive branch decisions, not stand-alone bases for challenging legislative action. For the foregoing reasons, we reverse the judgment of the district court. We remand for further proceedings consistent with this opinion, including any remaining proceedings on count II of Worthwhile's petition.

**Reversed and Case Remanded.**

All justices concur except McDermott, J., who files a dissenting opinion.

#24–1813, *Worthwhile Wind, LLC v. Worth Cnty. Bd. of Supervisors*

**McDermott, Justice (dissenting).**

After successfully attracting an energy company to develop wind turbine projects in Worth County, the Worth County Board of Supervisors backtracked and passed a moratorium barring the projects. But the developer, by that point three years into its turbine project, had already signed over 160 easement agreements to acquire land rights for the project, constructed two massive concrete footings for turbines, secured a connection to the midcontinent electrical grid, and spent millions of dollars. The majority today blesses the county's about-face and effectively kills the project despite its advanced stage. In my view, the facts here easily establish that the developer has a vested right under our precedents to finish the project.

The wind energy developer here, Invenergy, created Worthwhile Wind LLC as a project entity in 2018 to pursue the development of a new wind farm in Worth County. The Worthwhile project was to be Invenergy's second wind farm development in the county. Invenergy's first project, a smaller wind farm called Freeborn, was at that time nearing completion.

The Board welcomed Invenergy to develop new wind projects in the county. When the Worthwhile project began, there were already 229 wind turbines operating in the county. Seeking to expand the county's existing wind turbine network, the Board chair told Invenergy they would "take every additional [turbine] we can get." The Board formalized its pursuit in August 2017 by passing a resolution that officially invited further wind development in the county, stating in part:

> WHEREAS wind energy is a renewable energy source and an important component of our nation's energy independence portfolio;

WHEREAS wind energy now supplies over 35% of Iowa's total energy produced;

. . . .

WHEREAS Worth County, Iowa, currently has 229 turbines, which contribute close to $172,000,000.00 in assessed valuation to our count[y's] tax base;

WHEREAS that assessed valuation is nearly 16% of Worth County's total property valuation;

AND WHEREAS the development and existence of wind farms in Worth County not only contributes to the property tax base but also provides jobs to our citizens and ancillary support business opportunities, including a major off load intermodal transportation facility at Manly, Iowa, and multiple wind industry maintenance businesses in Winnebago and Worth Counties that work with wind farms across the Midwest;

. . . .

WHEREAS[] the development of wind projects in Worth County provides continued economic opportunity for residents and property owners of Worth County;

WHEREAS Worth County's experience with other wind projects has been positive and fruitful;

. . . .

THEREFORE, BE IT RESOLVED: The Worth County Supervisors support the further development of the Freeborn Wind Farm and confirm there are no county ordinances, permits or other approvals required for construction and operation of the project, and Worth County looks forward to seeing the Freeborn Wind Farm constructed and operating in the very near future.

Given the county's enthusiastic invitation for wind projects in the Board's resolution, the majority's statement that "Worthwhile perceived Worth County as favorable toward the development of wind energy projects" is, to say the least, an interesting characterization. The county deliberately—and successfully—cultivated that very perception.

As the resolution makes clear, the county sought to entice developers by promoting the county's favorable regulatory scheme for turbine projects. The resolution is explicit in trumpeting "there are no county ordinances, permits or other approvals required for construction and operation." Under the county's then-existing zoning ordinance, which had been in effect since 2009, installing wind turbines in most of the county required no permit. Worthwhile understandably designed the Worthwhile project to target the vast expanse of the county where, in the county's own words, no "permits or other approvals" to construct or operate were necessary.

Nonetheless, in April 2021, the Board, in a 2–1 vote, with two new supervisors on the three-person Board voting in favor, adopted a moratorium that banned the construction of wind turbines in the county until new wind regulations could be enacted. The Worthwhile project by this point had been ongoing for more than three years. Worthwhile attempted to negotiate a formal development agreement with the county in earnest over the following thirteen months. Despite these efforts, the Board, again on a 2–1 vote, enacted a new ordinance on June 27, 2022, that would, for the first time, regulate the construction and operation of commercial wind energy conversion systems throughout the county. *See* Worth County, Iowa, Ordinance 2022.06.27 (June 27, 2022). The various required setbacks in the new ordinance, taken together, eliminated nearly all the buildable areas that Worthwhile had targeted for construction. The ordinance also contained additional restrictions on sound, shadow flicker, lighting, and maximum height that further encumbered the project. Worthwhile filed suit against the county seeking a declaratory judgment to complete the project.

When a zoning law has been changed in a way that imposes a new restriction on an ongoing project, courts will not require compliance with the new law if either (1) the property owner has acquired a "vested right" under the prior law to complete the project, or (2) the municipality has acted in "bad faith" against the property owner in enacting the new restriction. *Geisler v. City Council*, 769 N.W.2d 162, 167 (Iowa 2009). After a trial, the district court ruled in Worthwhile's favor, finding both that Worthwhile had obtained a vested right to complete the project and that the county acted in bad faith with an improper purpose in adopting the moratorium and new ordinance.

We have been called upon to decide whether a developer has established a vested right to complete a project on numerous occasions. As we have observed, the concept of vested rights balances a property owner's private interests against the needs of the general public. *Kasparek v. Johnson Cnty. Bd. of Health*, 288 N.W.2d 511, 518 (Iowa 1980) (en banc). It recognizes that when an owner makes significant, legitimate investments before a new regulation is enacted, those expenditures can create a protected property right. *Id.* Under the law, this property right "cannot be arbitrarily interfered with or taken away without just compensation." *Id.*

Whether a property owner has acquired a vested right involves a two-part inquiry: "(1) did the property owner make substantial expenditures toward the use in question prior to the zoning change; and (2) were the expenditures made by the property owner lawful." *Quality Refrigerated Servs., Inc. v. City of Spencer*, 586 N.W.2d 202, 206 (Iowa 1998).

The district court found that Worthwhile had committed more than sufficient financial and human resources to the project to establish a vested right under the prior regulatory framework. These efforts and expenditures covered a

wide range of development activities and expenses before the April 2021 moratorium, including:

*Electric grid interconnection.* In March 2018, Worthwhile initiated the formal interconnection process with the Midcontinent Independent System Operator (MISO). Worthwhile paid over $600,000 in direct fees related to the MISO study and interconnection process. To maintain its priority in the grid queue, Worthwhile posted more than $3.8 million in security. These funds were nonrefundable and subject to forfeiture if the project withdrew.

*Land acquisition.* Worthwhile conducted a three-year campaign to secure real estate contracts for its turbines and related infrastructure. Among other expenditures, it spent upwards of $400,000 on land agents and paid more than $700,000 directly to Worth County landowners. It entered into 162 easement agreements. Under these recorded easements, Worthwhile is contractually obligated to pay an additional $1.7 million over the remaining easement terms.

*Technical due diligence and permitting.* Worthwhile invested over $160,000 for specialized technical and environmental site studies, including aviation surveys, microwave path studies, and environmental and wildlife impact assessments. It also spent roughly $34,000 to erect and operate two meteorological towers to gather data. One of the towers was within a zoned area of the county; the Board permitted and approved its installation without objection. Worthwhile further secured necessary environmental permits from the Iowa Department of Natural Resources and engaged engineering consultants to design site-specific infrastructure.

*Physical site development.* Worthwhile moved into the physical construction phase by completing "seal slab" foundations for two wind turbines. These enormous concrete bases were each ninety-one feet across and thirteen

feet deep. Between geological testing, professional design, and contractor labor, the construction of these foundations totaled over $300,000.

All told, the district court calculated that Worthwhile had committed over $7 million to the project by the time the Board adopted the moratorium. The district court concluded that the "plans, studies, analysis, regulatory application, landowner engagement, and financial commitments were substantial" and thus "secured vested rights in the existing zoning scheme."

In analyzing whether Worthwhile established a vested right against a zoning change, the majority abandons our established two-part test. Instead, the opinion flatly asserts that no vested right exists unless a property holder possesses a permit at the time of a zoning change. Applying this new standard, the majority concludes that Worthwhile had no vested right because it had not sought or received a permit when the Board adopted the moratorium—even though no permit was required.

The majority's rationale suffers from two fatal defects. First, our precedents do not make a permit a prerequisite for a vested right. Indeed, many of our past decisions directly contradict the majority's new rule. Take *Kasparek v. Johnson County Board of Health*, where a county passed a new ordinance requiring lot sizes of five acres as a prerequisite to receiving a permit for a septic tank system. 288 N.W.2d at 516. Property owners who had purchased smaller lots before the change claimed a vested right under the prior regulations, which had no lot size requirement. *Id.* We held that these owners had a vested right to install septic systems under the prior regulations. *Id.* at 520. Nothing in our opinion even hinted that the owners' lack of a permit at the time of the ordinance's adoption somehow disqualified them from having a vested right.

The same principle applied in *Incorporated Town of Carter Lake v. Anderson Excavating & Wrecking Co.*, where the defendant operated a landfill under a ten-year lease approved by the city. 241 N.W.2d 896, 902 (Iowa 1976). Two years later, the city passed an ordinance requiring a permit to continue operating the landfill. *Id.* at 899. We held that the previously approved lease gave the defendant a vested right to use the property as a landfill despite having no permit. *Id.* at 902.

We reached a similar conclusion in *Board of Supervisors v. Paaske*. 98 N.W.2d 827, 831 (Iowa 1959). There, a property owner planned to move five houses onto a 2.4-acre parcel in LeClaire Township. *Id.* at 828. Although the owner had a permit to *remove* the houses from their original locations, the LeClaire parcel itself was not subject to any zoning laws at the time of the purchase. *Id.* But before the houses were installed, the county passed an ordinance requiring at least one acre per residence in LeClaire. *Id.* We held that the owner had a vested right to complete the project despite the new ordinance. *Id.* at 831. Notably, our analysis didn't mention a construction permit as a prerequisite, which makes sense considering no such permit was required before the ordinance was adopted. *See id.*

Likewise, in *Nemmers v. City of Dubuque*, the United States Court of Appeals for the Eighth Circuit applied Iowa law to determine whether a developer had acquired vested rights for industrial development of his property after the city annexed and rezoned the property for residential use. 716 F.2d 1194, 1197 (8th Cir. 1983). Rather than focusing on a building permit—which the developer never obtained—the court emphasized that assessing vested rights "is necessarily an ad hoc inquiry." *Id.* Relying heavily on *Paaske* and *Kasparek*, the court held that the developer's $140,000 investment in preliminary grading and

road work was sufficient to vest his right to complete the project for industrial use under the prior zoning regulations. *Id.* at 1198–99.

Invenergy designed the Worthwhile project by targeting turbine sites in unzoned areas of the county. The only part of the project requiring a permit from the county—for a data tower in a zoned township—was secured before Worthwhile constructed it. The majority penalizes Worthwhile for lacking a permit that the county had made clear was never required in the first place. The majority doesn't explain what permit was even *available*, let alone required. What was Invenergy supposed to do in this situation? Lobby the supervisors to zone the county's unzoned areas so it could then ask for a permit?

Stated simply, the majority's core premise—that "until the property owner has asked for and received a permit, the property owner's plans remain speculative, and no property right has crystallized"—directly conflicts with our precedents. If vested rights were truly contingent on a building permit, our repeated recognition of those rights in cases where no permit existed would be inexplicable. Since the project did not depend on obtaining a county building permit, Worthwhile's vested rights claim cannot fail for the lack of one. We recognize vested rights when a county amends an existing zoning requirement; there is no logical reason to deny those same rights when no zoning requirement existed to begin with.

By misstating the proper test, the majority reaches the wrong answer. Unlike the majority's new permit rule, our longstanding two-part inquiry for vested rights offers the better mode of analysis. Again, under that two-part inquiry, we consider (1) whether the property owner made substantial expenditures toward the use in question before the zoning change, and (2) whether the owner's expenditures were "lawful." *Quality Refrigerated Servs.,*

*Inc.*, 586 N.W.2d at 206. In this case—just as in *Kasparek* and *Paaske*—the expenditures were lawful not because the property owners held building permits but because none were needed.

A permit is relevant to lawfulness—but only when a permit is required. *See Geisler*, 769 N.W.2d at 168 ("[W]ithout the *required* building permit, the landowner's expenditures were illegal and, therefore, could not be relied upon to acquire a vested right.") (emphasis added). The majority calls unzoned areas "regulatory vacuum[s]," where no enforceable rights exist absent the Board's approval. But the Board's decision not to zone an area is itself a regulatory choice, no less controlling than a decision to impose zoning requirements. Our precedents establish that owners may rely on the *absence* of a permit requirement just as readily as they would on an affirmative requirement. *See, e.g.*, *Kasparek*, 288 N.W.2d at 516; *Anderson Excavating*, 241 N.W.2d at 902; *Paaske*, 98 N.W.2d at 831. Where no permit is required, the owner's expenditures on a project are lawful and fully capable of supporting a vested right. *See Application of Campsites Unlimited, Inc.*, 215 S.E.2d 73, 77–78 (N.C. 1975) (clarifying that in prior cases relying on building permits to establish vested rights, "[t]he only significance of the building permit . . . was that such permit was required, under the ordinance in effect at the time of its issuance, in order to make the proposed use of the property lawful").

Interestingly, the majority attempts to explain our finding of vested rights in *Kasparek*—where no permit was ever issued—by suggesting that the county's prior approval of a *plat map* with smaller than five-acre lots sufficed in place of a permit. But *Kasparek* certainly does not stand for the proposition that an approved plat serves as a condition precedent to acquiring a vested property right against a zoning change. 288 N.W.2d at 518. (Here, no one argues that

Worthwhile needed a plat approval for the project.) *Kasparek* relied on *Paaske*—identifying it as "[t]he most analogous Iowa decision"—and its test analyzing the owner's "legitimate and valuable expenditures in connection with the use of an affected tract or in a business conducted on it, before imposition of the regulation." *Id.* The majority confuses the *evidentiary weight* of a permit or plat approval in determining whether expenditures were lawful, with a strict *legal requirement* to obtain one or the other. Again, our precedents have consistently focused on the owner's tangible actions and financial commitments, not whether the county issued a permit or approved a plat.

The majority's errors in its vested rights analysis do not stop there. In discussing whether Worthwhile's expenditures were sufficiently substantial, the majority compares the amount expended to the anticipated total cost of the completed project, which the majority notes could exceed $300 million. But there is no minimum ratio between expenditures and projected final cost that must be met to qualify as substantial. In *Paaske,* we found that the owner had acquired a vested right to continue with construction of the housing project where the owners had expended only $8,126 for preparatory work when the county tried to stop the project. 98 N.W.2d at 828–29. In considering the sufficiency of the expenditure, we declared: "It is impossible to fix a definite percentage of the total cost which establishes vested rights and applies to all cases. It depends on the type of the project, its location, ultimate cost, and principally the amount accomplished under conformity. Each case must be decided on its own merits, taking these elements into consideration." *Id.* at 831. In the lengthy history of Iowa cases addressing vested rights, none has ever compared the amount expended to an estimated final cost. The only Iowa case that mentions such an

exercise, *Paaske*, never actually discussed the project's total cost, and our holding certainly does not rely on some ratio derived from it. *See id.*

What's more, even if a cost ratio were a relevant consideration in determining whether expenditures were substantial, the total cost to construct the project is not the correct comparator here. As the district court found, Invenergy designed Worthwhile to be a "development-transfer" project, meaning that it would be sold to a customer to complete construction once Worthwhile finished developing it. As the trial evidence established, the total sale price of the developed-but-not-yet-constructed project here ranged from $11.5 million to $33 million. Even if we were to apply a ratio, the district court's finding that Worthwhile had spent $7 million by the time the Board passed the moratorium would be sufficiently substantial as compared to these figures.

More broadly, Worthwhile's $7 million expenditure blows away sums in prior cases that we (or the Eighth Circuit applying Iowa law) deemed substantial enough to create a vested right. *See Quality Refrigerated Servs., Inc.*, 586 N.W.2d at 206–07 ($650,000 found substantial); *Nemmers*, 716 F.2d at 1198–99 ($140,000); *Kasparek*, 288 N.W.2d at 518 ($13,000); *Paaske*, 98 N.W.2d at 829 ($8,126); *Stoner McCray Sys. v. City of Des Moines*, 78 N.W.2d 843, 848–49 (Iowa 1956) ($600). Even when adjusted for inflation and added together, the combined total of amounts deemed substantial in all these cases is still just a fraction of the amount Worthwhile spent here. By any standard, Worthwhile's pre-moratorium expenditure was substantial.

Worthwhile proved a vested right to complete this project. Because the district court's judgment can be upheld by affirming its holding on vested rights alone, I will forgo discussion of the district court's alternative holding that

Worthwhile is entitled to judgment based on evidence that the Board acted in bad faith.

Worthwhile had spent three years and millions of dollars developing this project when the Board passed the moratorium. By declaring Worthwhile's efforts insufficient to establish a vested right, the majority leaves future energy developers completely exposed as they consider the immense cost, risk, and complexity of large-scale wind energy projects. Beyond inventing a permit requirement that neither precedent nor logic dictates, today's opinion suggests that even tens of millions of dollars in expenditures may still not qualify as substantial. "Predictability . . . is a needful characteristic of any law worthy of the name." Antonin Scalia, *The Rule of Law as a Law of Rules*, 56 U. Chi. L. Rev. 1175, 1179 (1989) (footnote omitted). By turning away from our vested-rights precedents, we have severely undermined predictability not only for the developer in this case, but for all developers considering complex wind energy projects in our state.

There is an oft-cited legal maxim coined by Justice Oliver Wendell Holmes that "[m]en must turn square corners when they deal with the Government." *Rock Island, A. & L. R. Co. v. United States*, 254 U.S. 141, 143 (1920). But as Justice Robert Jackson observed, "It is very well to say that those who deal with the Government should turn square corners. But there is no reason why the square corners should constitute a one-way street." *Federal Crop Ins. v. Merrill*, 332 U.S. 380, 387–88 (1947) (Jackson, J., dissenting). In this case, the county has been allowed to treat its obligation to recognize vested rights as precisely the one-way street Justice Jackson warned against. By failing to recognize Worthwhile's vested right to complete the project, the majority has denied Worthwhile the legal protections it should have been able to rely on. Respectfully, I dissent.